In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-09-00016-CR


______________________________




PAUL EDWARD LAMMONS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 173rd Judicial District Court


Henderson County, Texas


Trial Court No. B-15,975




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Moseley



MEMORANDUM OPINION



 After a Henderson County (1) jury found Paul Edward Lammons guilty of aggravated robbery,
Lammons submitted the issue of punishment to the trial court. After a hearing on punishment, the
trial court found the two enhancement allegations to be true, sentencing Lammons to forty-five years'
imprisonment in the Institutional Division of the Texas Department of Criminal Justice and
restitution of $10,320.75. On appeal, Lammons challenges the legal and factual sufficiency of the
evidence to sustain the conviction, and further complains that in closing arguments to the jury, the
State was permitted to shift the burden of proof. We affirm. 

I. FACTUAL AND PROCEDURAL HISTORY 

 During the day prior to the evening of the assault on him on August 7, 2007, seventy-six-year-old Mitchell Manning led a routine life set by the demands of his Shady Oaks Mercantile
Convenience Store and his trucking company (a small enterprise mostly involved in transporting
rocks, sand, and soil). The store opened at 7:00 a.m. and closed at 8:00 p.m. In addition to working
in the store, Manning counted the money every night and placed it in a pouch for deposit the next
morning. After completing his routine on August 7, Manning closed the store at about 8:10 or 8:15
and made the short, four-mile drive to his home in his white Dodge pickup truck. 

 Manning had the trusting habit of never locking the doors to his home. On August 7, this
proved to be a bad habit. As he entered his front door, Manning discovered it to be partially blocked,
a blocking which Manning initially believed to be caused by his dog, which stayed in the house. 
Instead of discovering the dog at the door, Manning was faced with a tall man in a ski mask, holding
a gun. The masked man slammed the door into Manning, grabbed him, and then kicked him into
a glass gun case. Shards of the gun case's shattered glass lacerated Manning's hands and abdomen,
causing him to bleed. The intruder shoved his left knee onto Manning's back and placed a revolver
to Manning's head. At that point, a second, smaller intruder donning a ski mask appeared in
Manning's sight. Together, the intruders stood Manning up and told him they only wanted his
money. They moved Manning to the den, laid him face down, grabbed his keys, pocket knife,
passport, and wallet, and tied his hands behind his back with a phone charger cord and electrical
tape. Holding the pistol to his head, the intruders threatened Manning's life, moved him into the
master bedroom, and asked him whether he had any more guns in the home. Manning reported to
them that there was a Smith and Wesson revolver under the pillow on the bed, a .12-gauge shotgun
in the closet, and a shotgun, rifle, and pistol in the pickup Manning had been driving. The intruders
tied Manning's feet with duct tape and forcefully pushed him backward into the closet, where his
head was slammed into the rear wall, causing him to begin bleeding from an abrasion or cut suffered
from the blow. The taller intruder informed Manning that "she" (referring to the other, smaller
intruder) was going to start the truck and that he would shoot if he heard Manning trying to escape
from the closet. Manning was left tied up, with blood running down his hands and arms, a shard of
glass still embedded in his abdomen, and a bleeding, injured head. 

 When the house fell silent, Manning slipped the electrical tape off of his hands, crawled to
the window, saw that his pickup truck was gone, and quickly inventoried the items missing from his
home. He determined that the intruders had stolen his guns, pocket knife, billfold with his driver's
license, social security and medicare cards, $600.00 in cash, and credit cards, in addition to his
ostrich-skin boots, cell phones, money he had brought from the convenience store (including coins
placed in a plastic bag), and a jewelry box containing wedding rings, necklaces, and silver dollars. 
Because the robbers had taken his cell phones, Manning had no means to report the incident from
his home. He walked to one of his large trucks used for hauling rocks and gravel and drove from
his home to the highway, where he hailed a passing pickup truck and had its driver call the police. 
The driver of the pickup truck took Manning to his home, where the good Samaritan and his wife
cleaned Manning up. Manning's daughter (who had been contacted) retrieved Manning and returned
him to his own home. 

 Officer Kevin Adair arrived and observed that Manning was shaken, scared, upset, and that
he had blood on his hands and abdomen. At Adair's recommendation, an ambulance was called and
Manning was taken to the hospital. 

 In an interview with investigator Wilford Gabbard, Manning described the tall intruder as
being between six feet and six feet five inches tall, with a medium build, while the shorter intruder
stood between five feet ten inches and six feet tall, having a skinny, petite build. Because Manning
believed that his dog's behavior toward the intruders indicated that they were familiar to him, he
initially suspected Jeremy Costlow, his former employee who had lived with Manning's daughter and 
tried to rob him once before, as being the shorter of the two assailants. (2) 

 A little over six hours after the robbery took place, off-duty Bell County deputy sheriff Curtis
Nichols was performing security patrol work for a car dealership when he spotted a white Dodge
pickup driving through the lot. Since the dealership was closed for the night, the presence of the
vehicle aroused his suspicion, so he stopped it. Lammons was driving the truck, and Julie Rigsby
was a passenger. In response to Nichols' request, Lammons produced a driver's license. When
Nichols conducted a computer search of the license plate number on the truck, the results showed
the vehicle as being reported stolen from Manning. This caused Nichols to look more closely at the
driver's license which Lammons had produced and Nichols noticed that the photograph on the license
was not a picture of Lammons; the license which Lammons had produced was one issued to
Manning. When Nichols informed Lammons that the vehicle had been reported as stolen, Lammons
attempted to explain the report away by representing "that he was a family member and they had had
a fight, and they were upset, and that's why the truck was reported stolen." Nichols' search of the
vehicle revealed the pistol, .12-gauge shotgun, and .22 rifle which had been in Manning's truck,
together with a jewelry box, several credit cards issued to Manning, ski masks, (3) three pocket knives,
cell phones, and a silver watch. Although Rigsby did not have any money on her person, Lammons
possessed $1,131.00 in cash in one pocket, $37.00 in the other, and a plastic bag full of change was
in the truck. No Smith and Wesson revolver was located. 

 At trial, Lammons pointed the finger at the original suspect who Manning had named:
Costlow. Costlow's wife, Christy, testified that she knew Rigsby and Lammons, that they were
staying at a local park, and that the two stayed the night with the Costlows in their home right behind
Manning's store on August 6. Mrs. Costlow believed that neither Risgby nor Lammons had any
money at that time because they were homeless, staying in parks or abandoned homes. A few hours
before the robbery, they asked to be dropped off at Rose Cemetery, a half mile from Manning's store. 
At their request, Mrs. Costlow let them out of her car at the cemetery about 6:00 or 6:30 p.m. the
evening of the robbery. (4) She claimed that during the time the robbery took place, she was eating
dinner with her husband at a local restaurant, a place where they remained together until 11:00 p.m. 

 Mr. Costlow is six feet tall and weighs 155 to 180 pounds. Lammons is six feet two inches
tall and weighs 155 pounds. Gabbard testified there was no evidence linking Mr. Costlow to the
crime and opined that Mrs. Costlow did not fit the description of either assailant as given by
Manning. Nevertheless, he was of the opinion that the Costlows were somehow involved in the
robbery as well. There were several items stolen from Manning which were not recovered from the
truck during Lammons' arrest, and the investigation led police officers to Mr. Costlow's home, where
they found a revolver and stolen items from a different burglary. Larry Merritt, an inmate housed
in jail with Lammons, testified that Lammons had asked him to provide untrue testimony; Lammons
wanted him to tell the jury that he overheard Mr. Costlow say in church that he (Costlow) had stolen
the truck. Although Merritt indicated that he had never heard Lammons claim that he stole the truck,
Lammons did tell him facts about the robbery and indicated to Merritt that he could not be identified. 

 On appeal, Lammons complains that the fact that he "was found in the victim's vehicle six
hours after the robbery occurred is insufficient" and that the jury's conviction amounted to "no more
than mere suspicion, and required the jury to speculate" on the issue of Lammons' guilt. We disagree
that this is the only inculpatory evidence that the jury heard and disagree with the conclusion. 

II. STANDARD OF REVIEW

 It is well settled in Texas that Lammons' "unexplained possession of property recently stolen
. . . permit[ted] an inference that [he was] the one who committed" the robbery. Poncio v. State, 185
S.W.3d 904, 905 (Tex. Crim. App. 2006); Dixon v. State, 43 S.W.3d 548, 552 (Tex.
App.--Texarkana 2001, no pet.). However, in addition to possession being personal, recent, and
unexplained, Lammons must have distinctly and consciously asserted his right to the property for
the inference to be warranted. Dixon, 43 S.W.3d at 552. In any event, the inference of guilt is not
conclusive, and the sufficiency of the evidence must still be examined according to applicable
standards of review. Id. (citing Hardesty v. State, 656 S.W.2d 73, 77 (Tex. Crim. App. 1983)). 

 Legal and factual sufficiency questions involve separate analyses. The requirement of legal
sufficiency serves as a tool to determine whether submission of an issue is required. Clewis v. State,
922 S.W.2d 126, 132-33 (Tex. Crim. App. 1996). In other words, if the evidence in this case was
insufficient to raise an issue of Lammons' guilt, it should not have been submitted for the jury's
decision, and we must render a judgment of acquittal. Id. When conducting this analysis, we review
all of the evidence in the light most favorable to the verdict and determine whether any rational jury
could find the essential elements of the crime beyond a reasonable doubt. Hooper v. State, 214
S.W.3d 9, 13 (Tex. Crim. App. 2007); Lacour v. State, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000)
(citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)); Clewis, 922 S.W.2d at 132-33; Saxton v.
State, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). 

 Once we determine the evidence raised issues for the jury's resolution, we will not sit as the
thirteenth juror re-evaluating the weight and credibility of the evidence. Williams v. State, 235
S.W.3d 742, 750 (Tex. Crim. App. 2007); Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App.
1999). Instead, we give full play to the jury's responsibility to weigh the evidence, resolve conflicts
in the testimony, and draw reasonable inferences from basic facts. Johnson v. State, 23 S.W.3d 1, 7
(Tex. Crim. App. 2000); Clewis, 922 S.W.2d at 133; Bottenfield v. State, 77 S.W.3d 349, 354 (Tex.
App.--Fort Worth 2002, pet. ref'd) (citing Jackson, 443 U.S. at 319). 

 On the other hand, because factual sufficiency is an issue of fact, we are not free to re-weigh
the evidence and set aside the jury verdict merely because we feel a different result is more
reasonable. Clewis, 922 S.W.2d at 135. In reviewing Lammons' claim that the evidence in this case
amounted to "no more than a suspicion," we will not engage in a second evaluation of the evidence,
but will only ensure that the jury reached a rational decision. Cuong Quoc Ly v. State, 273 S.W.3d
778, 783 (Tex. App.--Houston [14th Dist.] 2008, pet. ref'd) (citing Muniz v. State, 851 S.W.2d 238,
246 (Tex. Crim. App. 1993)). Thus, we give due deference to its determinations and will find the
evidence factually insufficient only when necessary to prevent manifest injustice. Johnson, 23
S.W.3d at 8-9, 12; Clewis, 922 S.W.2d at 133, 135. Circumstantial evidence is as probative as direct
evidence in establishing the guilt of an actor. Hooper, 214 S.W.3d at 13. As long as the cumulative
force of all incriminating circumstances is sufficient to support Lammons' conviction, each fact need
not directly point to his guilt. Id. (citing Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App.
1993)). 

 In contrast to a legal sufficiency review, we examine the evidence in a neutral light when
assessing factual sufficiency and determine whether the proof of guilt is obviously weak as to
undermine confidence in the verdict, or, if taken alone, is greatly outweighed by contrary proof so
as to be clearly wrong and unjust. Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003);
Johnson, 23 S.W.3d at 11; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Harris v.
State, 133 S.W.3d 760, 764 (Tex. App.--Texarkana 2004, pet. ref'd). A clearly wrong and unjust
verdict is manifestly unjust, shocks the conscience, or clearly demonstrates bias. Santellan v. State,
939 S.W.2d 155, 165 (Tex. Crim. App. 1997). 

 We also measure the evidence "against the elements of the offense with the same kind of
analysis as that applied in the test for a hypothetically-correct jury charge for the case." (5) Ferralez
v. State, No. 06-08-00064-CR, 2009 WL 454335, at *1 (Tex. App.--Texarkana Feb. 25, 2009, no
pet.) (citing Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); see also Grotti v. State,
273 S.W.3d 273, 280 (Tex. Crim. App. 2008). The hypothetically correct jury charge "sets out the
law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or
unnecessarily restrict the State's theories of liability, and adequately describes the particular offense
for which the defendant was tried." Malik, 953 S.W.2d at 240. It is used to evaluate both legal and
factual sufficiency. Grotti, 273 S.W.3d at 281. 

III. ANALYSIS 

 A. Sufficient Evidence Supported the Rejection of Smalley's Self-Defense Theory

 The hypothetically correct jury charge in this case would require the jury to find that:
1) Lammons, 2) intentionally, knowingly, or recklessly, 3) used or exhibited a weapon, or threatened
or placed another person of at least sixty-five years of age, 4) in fear of imminent bodily injury or
death, 5) while appropriating property, 6) without the lawful owner's consent. Tex. Penal Code
Ann. §§ 29.02, 29.03 (Vernon 2003), § 31.03 (Vernon Supp. 2008).  

 Here, Lammons spent the night in close proximity to Manning's store and home the night
before the robbery. He was found only six hours after the robbery in Manning's truck, carrying a
majority of the stolen loot and exhibiting Manning's driver's license. See Hardesty, 656 S.W.2d at
77 (found inference of guilt where defendant was found with stolen property fifteen days after it was
stolen). Lammons, a man whom Mrs. Costlow had only shortly before the robbery believed to have
been virtually penniless, also had a large amount of cash in his pockets. He clearly lied and claimed
he was Manning's family member when questioned about the stolen car. He fit Manning's
description of the tall intruder, and the testimony of Lammons' cell mate concerning admissions
against interest incriminated him. Lammons was with Rigsby prior to the robbery and Manning
testified the tall intruder referred to the other intruder during the robbery as a "she." We conclude
that the evidence was legally sufficient to submit the question of Lammons' guilt to the jury. 

 Lammons argues that the evidence was factually insufficient because there was no evidence
found in Manning's home that could identify him. He pointed to Mr. and Mrs. Costlow, recounted
that Manning's initial suspect was Mr. Costlow based on his dog's reaction to the intruders, and
generally questioned law enforcement officers' failure to conduct a more thorough investigation and
confirm the Costlows' alibi. Lammons also pointed out that the pistol stolen from Manning's home
was not among the possessions found in the truck, that one was later found in Mr. Costlow's home,
and that it would be difficult for Lammons to travel the distance between Rose Cemetery and
Manning's home on foot in only two hours. It was within the jury's province to resolve any conflicts
in the evidence and decide which version of the events to believe. See Wesbrook v. State, 29 S.W.3d
103, 111-12 (Tex. Crim. App. 2000). The jury was free to disregard evidence regarding the reaction
that Manning's dog had to the intruders and the questions raised by the defense concerning the
Costlows' whereabouts on the night of the robbery. When reviewed in a neutral light, we conclude
the totality of the evidence was factually sufficient to reasonably convict Lammons. His first and
second points of error are overruled. 

 B. State's Closing Arguments Were Not Improper 

 Summation of the evidence, reasonable deduction from the evidence, and answers to
arguments of opposing counsel are proper fodder for jury argument. Felder v. State, 848 S.W.2d 85,
94-95 (Tex. Crim. App. 1992). Even if a jury argument exceeds the bounds of proper argument, an
"erroneous overruling of a defendant's objection is not reversible error unless it affected the
appellant's substantial rights." Montgomery v. State, 198 S.W.3d 67, 95 (Tex. App.--Fort Worth
2006, pet. ref'd); see Tex. R. App. P. 44.2(b). In determining whether Lammons' substantial rights
were affected, we consider the severity of any misconduct, the curative measures, and the certainty
of conviction, absent the misconduct. Montgomery, 198 S.W.3d at 95; Martinez v. State, 17 S.W.3d
677, 692-93 (Tex. Crim. App. 2000). After acknowledging that the police could have further and
more thoroughly investigated the robbery and whereabouts of the Costlows (but did not do so), the
State said:

 But you know what? None of that stuff in any way shows that these defendants aren't
responsible for their crime. Name one piece of evidence that was brought before you
by the State or the defense that shows these defendants are not responsible - - 

 

 [DEFENSE COUNSEL]: Judge, I object to that as an attempt to shift the
burden of proof by the State. 

 

 [STATE]: Judge, I don't have a burden to produce all the evidence, just on
these elements. And I'm not shifting the burden of proof. 

 

 THE COURT: Overruled. 

 

 [STATE]: Any evidence brought forth by the defense or the State that shows
that these defendants didn't commit this offense. Anything. Y'all can consider all the
evidence. The evidence brought by me, the evidence brought by the defendants. (6) 


Lammons argues that these statements shifted the burden of proof to Lammons when the entire
burden of proof remained with the State. (7) However, it appears that the State was simply trying to
emphasize the point that the testimony which might be favorable to show that the Costlows may have
been involved in the robbery in some fashion did not contradict or diminish the proof of Lammons'
guilt of the crime. See Caron v. State, 162 S.W.3d 614, 618 (Tex. App.--Houston [14th Dist.] 2005,
no pet.). Moreover, absent comment on the defendant's lack of testimony, "the State may comment
on appellant's failure to present evidence in his favor" during jury argument. Id. (citing Jackson v.
State, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000)); Sanders v. State, 74 S.W.3d 171, 173 (Tex.
App.--Texarkana 2002, pet. ref'd). Here, when placed in context with the record, the State's jury
argument was proper. (8)


IV. CONCLUSION

 We affirm the judgment of the trial court. 



 Bailey C. Moseley

 Justice


Date Submitted: July 22, 2009

Date Decided: July 23, 2009


Do Not Publish


1. This case was transferred to this Court from the Twelfth District Court of Appeals in Tyler
as a part of the Texas Supreme Court's docket equalization program. We are not aware of any
conflict between the precedent of the Tyler Court with precedent of this Court on any issue relevant
to this appeal. See Tex. R. App. P. 41.3. 
2. Manning also suggested another name, Chad Sorrells, as a potential suspect, but remembered
neither the suggestion nor the name at trial.
3. The ski masks were not logged on the evidence list. 
4. Mrs. Costlow's testimony placed Lammons and Rigsby about four and a half to five miles
from Manning's home two hours before the robbery. 
5. The hypothetically correct jury charge analysis set out in Malik is supposed to be conducted
"even in the absence of alleged jury charge error." Gollihar v. State, 46 S.W.3d 243, 255 (Tex.
Crim. App. 2001). 
6. The State also made the following statement which was not objected to and was not made
the subject of any motion for new trial: "You know what, there's absolutely no evidence that's been
presented at this trial that those defendants got that truck in any way other than the robbery at
Mr. Manning's house . . . ." 
7. The State failed to reply to this point of error in its briefing which focused on whether these
statements commented on Lammons' failure to testify, which was never addressed in Lammons'
brief. "An objection that the State's argument shifts the burden of proof does not comport with an
appellate challenge that the State's argument commented on a defendant's failure to testify." 
Freeman v. State, No. 01-05-01181-CR, 2007 WL 14469, at *2 (Tex. App.--Houston [1st Dist.]
Jan. 4, 2007, pet. ref'd) (mem. op.) (not designated for publication) (citing Paster v. State, 701
S.W.2d 843, 849 (Tex. Crim. App. 1985)). 
8. Nevertheless, curative measures were taken in the form of the court's charge, which stated:
"The law does not require a defendant to prove his innocence or produce any evidence at all. The
presumption of innocence alone is sufficient to acquit the defendant, unless you are satisfied beyond
a reasonable doubt of the defendant's guilt . . . ." Absent any evidence to the contrary, we must
presume the jury followed the court's charge as given. Gamboa v. State, No. AP-75,635, 2009 WL
928552, at *4 (Tex. Crim. App. Apr. 8, 2009); Colburn v. State, 966 S.W.2d 511, 520 (Tex. Crim.
App. 1998). Further, even if there had been erroneous argument, an analysis of jury argument error
would require that we weigh three factors to determine if it resulted in harm to Lammons' substantial
rights: (1) severity of the misconduct (the magnitude of the prejudicial effect of the State's remarks);
(2) curative measures taken (the efficacy of any cautionary instruction by the judge); and (3) the
certainty of conviction absent the misconduct (strength of evidence supporting conviction). Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (citing United States v. Millar, 79 F.3d 338,
343 (2nd Cir. 1996); United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1994)). This
circumstance would not have met that test for harm. 


 lifestyle and propensity to
violence, it was ineffective assistance of counsel not to make an offer of proof. None of Goodwin's
arguments, though, overcome the presumption that his trial counsel's actions were reasonable.
            Both the United States and the Texas Constitutions confer a right to effective representation
by counsel. U.S. Const. amend. VI; Tex. Const. art. I, § 10. If counsel's performance is ineffective,
the conviction cannot stand. The Texas Court of Criminal Appeals has held that the Texas
Constitution does not impose a higher standard than the Sixth Amendment. Jackson v. State, 877
S.W.2d 768, 771 (Tex. Crim. App. 1994); Hernandez v. State, 726 S.W.2d 53, 56–57 (Tex. Crim.
App. 1986). The Sixth Amendment standard, established by Strickland, requires a defendant
alleging ineffective assistance of counsel to show that counsel's performance at trial was deficient
and prejudiced the defense. See Strickland v. Washington, 466 U.S. 668 (1984); see also Bone v.
State, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). An ineffective assistance of counsel claim
cannot be based on a difference of opinion concerning strategy. "[T]he defendant must prove, by
a preponderance of the evidence, that there is . . . no plausible professional reason for a specific act
or omission." Bone, 77 S.W.3d at 836. Various factors should be considered in determining whether
counsel was effective, including pretrial motions, voir dire examination, cross-examination,
production of defense witnesses, objections, final argument, posttrial procedure, and the degree of
counsel's knowledge of the facts surrounding the case. Moya v. State, 661 S.W.2d 325, 328 (Tex.
App.—Corpus Christi 1983, no pet.).
            To satisfy the deficiency prong of the test, Goodwin must prove by a preponderance of the
evidence that his counsel's representation fell below the objective standard of professional norms.
Bone, 77 S.W.3d at 833. There is a strong presumption that counsel's performance was adequate. 
Id. The reason for this presumption is that counsel at trial is better positioned to judge matters of
strategy than an appellate court reviewing a cold record. An appellate court should not "conclude
the challenged conduct constituted deficient performance unless the conduct was so outrageous that
no competent attorney would have engaged in it." Garcia v. State, 57 S.W.3d 436, 440 (Tex. Crim.
App. 2001). 
            1.         Failure to Object to Photographs
            First, Goodwin argues that his trial counsel's performance was deficient in failing to object
to the introduction of the photographs of the victim and the crime scene. A succinct summary of
Goodwin's complaints is that the photographs are overly gruesome, larger than life size, cumulative
of other testimony and other photographs, and irrelevant. A failure to object to inadmissible
evidence is an act of omission that may give rise to ineffective assistance of counsel. Alvarado v.
State, 775 S.W.2d 851 (Tex. App.—San Antonio 1989, pet. ref'd). 
            All relevant evidence is admissible at trial unless otherwise barred by constitution, statute,
or rule. Tex. R. Evid. 401. Relevant evidence is that which tends to make a fact at issue more or
less probable. Id. A trial court should exclude evidence if "its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403;
Sonnier v. State, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995).
            The trial court is required to perform the Rule 403 balancing test when the offering party
makes the appropriate objection. Santellan v. State, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997).
Trial judges are required to exclude evidence when its probative value is substantially outweighed
by the danger of unfair prejudice. Tex. R. Evid. 403; Montgomery v. State, 810 S.W.2d 372, 392
(Tex. Crim. App. 1990) (op. on reh'g). In making this determination, the trial judge should "consider
the inherent tendency that some evidence may have to encourage resolution of material issues on an
inappropriate basis and should balance carefully against it the host of factors affecting probativeness,
including relative weight of the evidence and the degree to which its proponent might be
disadvantaged without it." Fuller v. State, 829 S.W.2d 191, 206 (Tex. Crim. App. 1992). A trial
court's decision in balancing these factors is reviewed under the abuse of discretion standard and is
disturbed on appeal only when the trial court's decision falls outside the zone of reasonable
disagreement. Mozon v. State, 991 S.W.2d 841, 846–47 (Tex. Crim. App. 1999); Montgomery, 810
S.W.2d at 391–92 (op. on reh'g); Manning v. State, 126 S.W.3d 552, 555 (Tex. App.—Texarkana
2003, no pet.). 
            Generally, autopsy photographs are admissible unless they depict mutilations of the victim
due to the autopsy itself. See Rojas v. State, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998).
Photographs showing a victim's wounds may be admitted to clarify and support observations about
the victim's injuries and to reveal the manner of death. See Moss v. State, 860 S.W.2d 194, 196 (Tex.
App.—Texarkana 1993, no pet.). While many of these photographs are cumulative of the testimony
by the State's witnesses, the general rule is that a trial court does not abuse its discretion where
pictorial evidence will aid the jury in understanding verbal testimony. Harris v. State, 661 S.W.2d
106, 107 (Tex. Crim. App. 1983); see Williams v. State, 937 S.W.2d 479, 488 (Tex. Crim. App.
1996). Even when two or more pictures depict the same scene but from different perspectives, the
trial court does not necessarily abuse its discretion in admitting the photographs because "the jury
can gain information it might not otherwise have when viewing other pictures from other
perspectives." Bacey v. State, 990 S.W.2d 319, 326 (Tex. App.—Texarkana 1999, no pet.);
Troncoso v. State, No. 06-03-00065-CR, 2004 Tex. App. LEXIS 2578 (Tex. App.—Texarkana Mar.
24, 2004, no pet.) (not designated for publication). A trial court is given wide discretion when
deciding admissibility of photographs. Sonnier, 913 S.W.2d at 519. Rule 403 carries with it a
presumption that the evidence will be more probative than prejudicial. Tennison v. State, 969
S.W.2d 578, 580 (Tex. App.—Texarkana 1998, no pet.). We find the photographs were admissible;
therefore, trial counsel was not ineffective in failing to object to them.
            2.         Failure to Request Defensive Instructions
            Goodwin alleges that his attorney's performance at trial was deficient because counsel failed
to request instructions on lesser-included offenses, necessity, self-defense, and sudden passion
arising from adequate cause. At oral argument, Goodwin alleged that the failure to request an
instruction concerning self-defense requires a reversal. In support of this argument, Goodwin cited
Vasquez v. State, 830 S.W.2d 948 (Tex. Crim. App. 1992). In Vasquez, the Texas Court of Criminal
Appeals found that the failure to request an instruction on necessity constituted ineffective assistance
of counsel. Id at 951.
            Vasquez is distinguishable from the current situation. In Vasquez, necessity was the only
defense available to the defendant. Id. at 951; see Young v. State, 991 S.W.2d 835, 839 (Tex. Crim.
App. 1999). In addition, Vaquez's trial attorney failed to conduct any independent investigation,
adequately research the law, and failed to re-urge evidence of his alleged kidnapping after the State
had "opened the door." Vasquez, 830 S.W.2d at 951 n.4. 
            This record does not contain evidence of the reasons for trial counsel's conduct. Ineffective
assistance of counsel claims "must be firmly founded in the record." Thompson v. State, 9 S.W.3d
808, 813–14 (Tex. Crim. App. 1999). "If counsel's reasons for his conduct do not appear in the
record and there is at least the possibility that the conduct could have been legitimate trial strategy,
we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct
appeal." Ortiz v. State, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002); see Jackson, 877 S.W.2d at
771.
            Strategical considerations provide a reasonable explanation for the decision not to request
instructions on necessity, self-defense, and lesser-included offenses. The defense argued at trial that
the shooting was accidental and that Goodwin did not have the requisite intent to commit murder. 
The decision to pursue this theory rather than self-defense, necessity, or include the lesser-included
offenses concerned a matter of strategy. It is a valid strategic decision to focus on a single
exculpatory theory rather than to present the jury with every possible theory of the crime. If the
reasons for counsel's conduct do not appear in the record and there is at least the possibility that the
conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief
on an ineffective assistance claim on direct appeal. Murphy v. State, 112 S.W.3d 592, 601 (Tex.
Crim. App. 2003); Ortiz, 93 S.W.3d 88–89. Because Goodwin's trial counsel's reasoning for not
pursuing the self-defense theory are not contained in the record and the decisions could have been
strategic, we will defer to counsel's decisions concerning whether to request additional instructions. 
Goodwin had claimed in his original statement that the shooting was unintentional, allowing the
defense to pursue the defense of accident. The decision not to switch theories or to add alternative
theories was a strategic decision, which requires deference to the trial counsel's decision. This Court
should not consider the wisdom of such a strategy, since ineffective assistance of counsel claims
cannot be "built on retrospective speculation." Bone, 77 S.W.3d at 835. "[T]he defendant must
prove, by a preponderance of the evidence, that there is . . . no plausible professional reason for a
specific act or omission." Id. at 836. Since there are plausible professional reasons for such conduct,
Goodwin has failed to show that trial counsel's performance was deficient. 
            While trial strategy explains the failure to request issues of self-defense, necessity, and
lesser-included offenses at the guilt stage, a further reason must be presented concerning issues
arising during the punishment phase. At the punishment stage of a trial for murder, "the defendant
may raise the issue as to whether he caused the death under the immediate influence of sudden
passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a
preponderance of the evidence, the offense is a felony of the second degree."


 "Sudden passion" is
defined as "passion directly caused by and arising out of provocation by the individual killed or
another acting with the person killed which passion arises at the time of the offense and is not solely
the result of former provocation." Tex. Pen. Code Ann. § 19.02(a)(2) (Vernon 2003). "Adequate
cause" means "cause that would commonly produce a degree of anger, rage, resentment, or terror in
a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Pen.
Code Ann. § 19.02(a)(1) (Vernon 2003). If a defendant presents evidence raising the issue of
sudden passion, he or she is entitled to an instruction on this mitigating circumstance, even if the
evidence raising such an issue is contradicted, weak, impeached, or unbelievable. Trevino v. State,
100 S.W.3d 232, 238 (Tex. Crim. App. 2003). 
            The question is whether there was any evidence from which a rational jury could infer such
passion. Moore v. State, 969 S.W.2d 4, 11 (Tex. Crim. App. 1998). Anything more than a scintilla
of evidence is sufficient to entitle a defendant to a sudden passion instruction at punishment. See
Jones v. State, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). Finally, we note there is no
requirement that evidence admitted at the guilt/innocence phase of trial be reoffered to be considered
at punishment. Trevino, 100 S.W.3d at 238. Evidence on a punishment issue will often come out
in the course of the State's own evidence regarding the circumstances of the offense itself, at the
guilt/innocence phase of trial. Id.
            Goodwin did not present any evidence which would raise the issue of sudden passion. 
Evidence of fear alone, or self-defense, is not sufficient evidence to raise sudden passion. The record
must show some evidence of all the elements of Tex. Pen. Code Ann. § 19.02(d) (Vernon 2003). 
An actor who fears for his or her life may coolly and deliberately dispatch his or her assailant without
panic or hysteria. See Fry v. State, 915 S.W.2d 554, 559 (Tex. App.—Houston [14th Dist.] 1995,
no pet.). Evidence of fear is not enough unless the cause of the accused's fear could produce fear that
rises to a level of terror which makes a person of ordinary temper incapable of cool reflection. 
Merchant v. State, 810 S.W.2d 305, 310 (Tex. App.—Dallas 1991, pet. ref'd) (citing Daniels v. State,
645 S.W.2d 459, 460 (Tex. Crim. App. 1983)). Testimony that the defendant became enraged,
resentful, or terrified immediately before the shooting adequately indicates such a state of mind. 
Havard v. State, 800 S.W.2d 195, 217 (Tex. Crim. App. 1989) (op. on reh'g) (holding appellant's
testimony he was "emotionally hurt and mad at the time he raised his rifle" and feared for his life
when he "saw two men with weapons drawn coming toward him" was sufficient to require sudden
passion instruction). Since there is no evidence raising the issue of sudden passion, we cannot
conclude that trial counsel's performance was deficient for failing to request such an instruction.
            3.         Failure to Offer Proof of Lifestyle and Violence
            Goodwin also argues that the failure to make an offer of proof concerning the extraneous
evidence of Ford's lifestyle and past violent acts rendered his attorney's performance ineffective. We
disagree. 
            Goodwin's argument fails because the record does not indicate what such testimony would
have been. Ineffective assistance of counsel claims "must be firmly founded in the record." 
Thompson, 9 S.W.3d at 813–14. There was no motion for new trial or other hearing which could
have introduced evidence of such testimony. Since the record does not indicate what the testimony
would have been, we do not know what evidence could have been presented raising this issue. 
Without knowing what evidence was sought, we cannot determine whether it would have been
admissible. Not all acts of violence would be admissible—only the acts which would demonstrate
that Ford was the aggressor or that would illustrate Goodwin's reasonable apprehension would have
been admissible. Direct appeal is a poor vehicle to bring an ineffective assistance of counsel claim. 
Direct appeals often present a limited record for review of the typical issues raised in an ineffective
assistance point.


 One way to get evidence of counsel's trial strategy or other matters in the direct
appeal record is through a motion for new trial. Another way to develop a proper record is through
a hearing in a habeas corpus collateral attack. See generally Tex. Code Crim. Proc. Ann. art.
11.01–.65 (Vernon 1977 & Supp. 2004). 
            Further, ineffective assistance of counsel claims must be based on the totality of the
circumstances. Ex parte Welborn, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990). Although a
defendant is entitled to effective assistance of counsel, the accused is not entitled to errorless or
perfect counsel. Id. When considered in the totality of the circumstances, Goodwin has not shown
that his trial counsel's performance was deficient. Because Goodwin has failed to show that his
counsel's performance at trial was deficient, there is no need to examine the second prong of
Strickland.
            E.        Legally Sufficient Evidence Supports the Verdict
            In his fifth point of error, Goodwin alleges that the evidence was legally insufficient to
support the jury's verdict. Specifically, Goodwin argues the State failed to prove that he intentionally
or knowingly caused serious bodily injury and committed an act clearly dangerous to human life that
caused Ford's death. We conclude there is sufficient evidence to support the jury's verdict.
            In our review of the legal sufficiency of the evidence, we employ the standards set forth in
Jackson v. Virginia, 443 U.S. 307, 319 (1979). This calls on the court to view the relevant evidence
in the light most favorable to the verdict and determine whether any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d
1, 7 (Tex. Crim. App. 2000); Turner v. State, 805 S.W.2d 423, 427 (Tex. Crim. App. 1991). 
            Goodwin argues that the evidence is insufficient to prove that he intentionally shot Ford. The
State proved the requisite intent through circumstantial evidence. Proof of a culpable mental state
generally relies on circumstantial evidence. Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim.
App. 1991). Intent and knowledge can be inferred by the conduct of, the remarks of, and the
circumstances surrounding the acts engaged in by the accused. Ybarra v. State, 890 S.W.2d 98, 109
(Tex. App.—San Antonio 1994, pet. ref'd); Parramore v. State, 853 S.W.2d 741, 745 (Tex.
App.—Corpus Christi 1993, pet. ref'd). The State introduced sufficient circumstantial evidence that
Goodwin acted intentionally or knowingly when he pulled the trigger. The shotgun was a 20 gauge
pump action shotgun with no defects that would cause it to fire without the trigger being pulled. The
shotgun had a four and one-half pound trigger pull, which is not a "hair trigger," but not extremely
heavy. Lastly, Carol Ann Goodwin testified that, after Ford had been shot, Goodwin would not let
her go outside to help Ford because the "S-O-B needed to die." 
            When viewed in a light most favorable to the prosecution, sufficient evidence exists that a
rational juror could have concluded that Goodwin was guilty beyond a reasonable doubt. Ford died
from a single shotgun wound to the chest. Goodwin admitted to shooting Ford. The forensic
evidence was inconsistent with Goodwin's story. Bill Eubanks, an investigator with the Bowie
County District Attorney's Office, testified that, based on the blood spatter, Goodwin had been sitting
on the chair on the porch close to the wall of the house. Based on the combination of the height of
the victim, the height of the porch, the trajectory of the shot as horizontal, and the blood spatter,
Investigator Eubanks concluded that Ford had been standing on the concrete step in front of the
porch. The front porch was seven feet nine inches from the front door to the edge of the porch. No
soot or stippling were discovered on Ford's hands, although traces of antimony, barium, and lead,
which are found in gunshot residue, were detected on his hands. Stippling is an abrasion on the skin
caused by hot gunpowder. Soot or stippling should have been found on Ford's hands if they were
within a foot of the barrel. The spreading of the shotgun pellets indicated that Ford's left hand was
greater than one foot, but less than six feet away from the shotgun. The gunshot residue and lack
of soot and stippling indicated that the hand was three to four feet from the shotgun. Because
gunshot residue was also found on Ford's right palm, the right hand was up as well. Because a
rational juror could have found Goodwin guilty beyond a reasonable doubt, legally sufficient
evidence exits.
            F.        Factually Sufficient Evidence Supports the Verdict
            Goodwin's sixth point of error contends the evidence was factually insufficient to support the
jury's verdict. Specifically, Goodwin argues that the State failed to prove that he intentionally or
knowingly caused serious bodily injury and committed an act clearly dangerous to human life that
caused the death of Ford. There is sufficient evidence to support the jury's verdict.
            When reviewing a challenge to the factual sufficiency of the evidence to support the
conviction, we are required to determine whether, considering all the evidence in a neutral light, the
jury was rationally justified in finding guilt beyond a reasonable doubt. Zuniga v. State, No. 539-02,
slip op. at 8, 2004 Tex. Crim. App. LEXIS 668, *20 (Tex. Crim. App. Apr. 21, 2004). There are
two ways in which we may find the evidence to be factually insufficient. First, if the evidence
supporting the verdict, considered alone, is too weak to support the jury's finding of guilt beyond a
reasonable doubt, then we must find the evidence insufficient. Id. Second, if—when we weigh the
evidence supporting and contravening the conviction—we conclude that the contrary evidence is
strong enough that the State could not have met its burden of proof, we must find the evidence
insufficient. Id. "Stated another way, evidence supporting guilt can 'outweigh' the contrary proof
and still be factually insufficient under a beyond-a-reasonable-doubt standard." Id. If the evidence
is factually insufficient, then we must reverse the judgment and remand for a new trial. Clewis v.
State, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996).
            Goodwin's factual insufficiency argument focuses on whether the evidence showed he
possessed the required culpable mental state to commit the murder as alleged in the indictment. 
Goodwin was charged with murder by (a) intending to cause Ford serious bodily injury, and (b) by
pointing a gun at Ford, an act that is clearly dangerous to human life, and that act resulted in Ford's
death. See Tex. Pen. Code Ann. § 19.02 (a)(2). Goodwin contends that merely pointing a loaded
shotgun at the victim is not, in and of itself, an act clearly dangerous to human life, and that the
evidence does not show he intended to cause Ford serious bodily injury. 
            Goodwin argues that several pieces of evidence support his theory that the evidence is
factually insufficient. First, Goodwin told police that he had wanted Ford to leave the house because
Ford had apparently coerced Goodwin's daughter and nieces into smoking marihuana for the first
time. Second, Goodwin told police that he had only displayed the weapon so as to intimidate Ford,
but that Goodwin never intended to shoot Ford. Third, there was evidence that Ford had previously
attacked Goodwin, who suffered from multiple sclerosis and was thereby unable to adequately
defend himself. And, finally, the autopsy results confirmed Ford had used methamphetamine and
marihuana before his death, a fact which tends to support Goodwin's theory that he wanted Ford to
leave because of the drug use.
            We have stated the facts of this incident in detail in the previous discussion of the legal
sufficiency of the evidence. Among other things, this evidence shows that the firearm did not have
a hair trigger; the blood spatter evidence indicating that the gun was from one to six feet from Ford
when it discharged, refutes the contention that the gun was fired during a hand-to-hand struggle; and
Goodwin showed no remorse.
            When viewed in a neutral light, the evidence is factually sufficient. The credibility of the
witnesses is within the province of the jury. Jones v. State, 944 S.W.2d 642, 648 (Tex. Crim. App.
1996). The jury was entitled to believe the State's version of the events. The evidence supporting
the verdict, considered alone, is not too weak to support the jury's finding of guilt beyond a
reasonable doubt. After weighing the evidence supporting and contravening the conviction, we
conclude that the contrary evidence is not strong enough that the State could not have met its burden
of proof. 
            We affirm the judgment of the trial court.
 

                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          July 1, 2004
Date Decided:             July 23, 2004

Do Not Publish