**William Stanley FRY, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 14–94–00713–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 21, 1995.

Rehearing Overruled Jan. 18, 1996.

Jay Stuart Nedell, Houston, for appellant.

David Bosserman, Angleton, for appellee.

Before MURPHY, C.J., and ANDERSON and HUDSON, JJ.

## OPINION

HUDSON, Justice.

Appellant was convicted by a jury of murder. The trial court assessed appellant's punishment at confinement in the penitentiary for a term of 48 years. We affirm the court's judgment.

In his first point of error, appellant contends the trial judge erred when he incorrectly advised him that he was eligible for "shock" probation. Prior to the commencement of trial, appellant elected to have the jury assess his punishment. After the jury found him guilty, appellant sought to change his election and have the court assess punishment. The State acceded to the request. Before permitting the change, the trial judge carefully admonished appellant that if he elected to have the court assess his punishment, he would forfeit any chance to receive a probated sentence other than by way of shock probation. Appellant claims the trial court had no authority to grant shock probation, and that he was misled by the trial court's erroneous admonition.

At the time of this offense, Section 6(a)(3) of Article 42.12 of the Code of Criminal Procedure specifically excluded murder as one of the crimes for which a trial court could grant shock probation. Even though the trial court's admonition to appellant was incorrect, it is not reversible error under the facts presented here. The trial judge was under no obligation to admonish appellant regarding the consequences of changing his election. Moreover, appellant decided to change his election *before* receiving the court's faulty admonishment.

Further, to be eligible for shock probation, a defendant must be assessed a sentence of no more than 10 years. Because the trial court assessed a sentence of 48 years, the possibility of awarding shock probation never arose. The trial court's erroneous admonition was of no consequence. Appellant's first point of error is overruled.

In his second point of error, appellant claims the trial court erred in refusing to submit instructions on the lesser included offense of voluntary manslaughter. An accused is entitled to an instruction on every defensive issue raised by the evidence. *Hayes v. State,* 728 S.W.2d 804, 807 (Tex. Crim.App.1987). Before an instruction on a lesser offense is warranted, the lesser offense must be included within the proof necessary to establish the offense charged, and some evidence must exist in the record that would permit a jury to rationally find that if the defendant is guilty, he is guilty only of the lesser offense. *Bignall v. State,* 887 S.W.2d 21, 23 (Tex.Crim.App.1994).

The distinguishing factor between murder and voluntary manslaughter is the element of sudden passion. When raised by the evidence, proof of the absence of sudden passion becomes an implied element of murder. *Bradley v. State,* 688 S.W.2d 847, 851 (Tex.Crim.App.1985). Therefore, the *presence* of sudden passion in a murder case raises the lesser included offense of voluntary manslaughter. *Nobles v. State,* 843 S.W.2d 503, 511 (Tex.Crim.App.1992). Any evidence of sudden passion requires the court to include an instruction on voluntary manslaughter, if requested. *Locke v. State,* 860 S.W.2d 494, 495 (Tex.App.—Waco 1993, pet. ref'd).

The deceased, Jerry Bates, loaned a rental car to his girlfriend, Brenda Baggerly. When the couple broke up, Bates went to appellant's home accompanied by Baggerly's brother, Ronnie Coleman, to pick up the car. Bates and Coleman arrived in a pick up truck, and Bates instructed Coleman to stay in the truck while he went to appellant's door to get the keys to the car. What transpired thereafter is in dispute.

Coleman testified that he watched from the truck as Bates went to the front door. Appellant opened the door and appeared to invite Bates inside. A short time later, Coleman saw the two men wrestling over a rifle. Coleman immediately went to Bates' assistance.

In contrast, appellant contends Bates and Coleman were both standing on the porch when he opened the front door. He further claims Bates forced his way inside. Both parties agree Bates had a short wooden stake in his back pocket. Appellant testified that he was "scared" of Bates because the deceased had a reputation of being a "trained killer." Because he was afraid Bates would kill him, appellant picked up a rifle. Bates and Coleman attempted to disarm appellant in a short scuffle accompanied by "cussing and screaming."

Contrary to appellant's assertion that he never lost possession of the rifle, Coleman testified that he wrenched the rifle out of appellant's hands and laid it on a counter inside the house. The parties agree the keys were given to Bates, and he left the house with Coleman. While Bates headed toward the rental car carrying the keys in his right hand, Coleman walked to the truck. According to Coleman, as Bates neared the rental car, appellant stepped onto the front porch again armed with the rifle. Appellant then shot Bates in the back. When Coleman screamed, appellant threatened, "Shut up, fat m——r f——r or I'll shoot you too." Lying on the ground, Bates remarked that he was hit in a bad place and was dying. Appellant responded, "Oh, you want me to finish you off." Bates agreed, and appellant shot the decedent a second time.

In contrast, appellant contends that as Bates neared the rental car, the decedent said to Coleman "Go get the gun." As Coleman ran toward the truck, Bates turned to appellant, put his right hand in his pants pocket, and said, "I'm going to kill you m——r f——r, I'm going to kill you." Appellant claims Bates was 7 to 8 feet away and staring him straight in the eye. Fearing that Bates might be armed, appellant fired the first shot. Bates fell to the ground and tried to draw something from his pocket. While still "eye to eye," appellant shot Bates a second time.

Danny Miksch, appellant's neighbor, testified he heard a loud noise like a door slam and looked over at appellant's residence. Miksch saw appellant step out onto his front porch carrying a rifle. Appellant raised the rifle to his shoulder and fired one time. Still on the porch, appellant fired a second shot less than thirty seconds later.

Subsequent investigation by the medical examiner revealed that Bates was hit in the lower back and left buttock. Both wound tracks were from back to front. In explanation, appellant claims Bates must have turned away when he fired the rifle. The blood pool beside the rental car was 13 feet from the edge of appellant's porch.

At the time of this incident, Section 19.04 of the Penal Code defined voluntary manslaughter as a murder where the actor causes the victim's death while "under the immediate influence of sudden passion arising from an adequate cause." Adequate cause is defined in the same section of the

code as a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Because there is *some* evidence that he acted in self-defense, appellant contends he was entitled to an instruction on voluntary manslaughter.

■ "Self-defense" and "cool reflection" are not mutually exclusive concepts. An actor who fears for his life may coolly and deliberately dispatch his assailant without panic or hysteria. An instruction on self-defense does not automatically obligate the trial court to give a concomitant charge on voluntary manslaughter. Appellant's testimony that he feared for his life at the time of the shooting did not, in itself, entitle him to an instruction on voluntary manslaughter. *Huffman v. State*, 691 S.W.2d 726, 731 (Tex. App.—Austin 1985, no pet).

■ While it is possible for an actor to employ deadly force in self-defense while under the grip of terror so great as to render his mind incapable of cool reflection, we find no such evidence presented here. The court of criminal appeals has repeatedly held that fear, standing alone, does not raise the issue of sudden passion. *Jenkins v. State*, 740 S.W.2d 435, 443 (Tex.Crim.App.1983); *Smith v. State*, 721 S.W.2d 844, 854 (Tex.Crim.App. 1986); *Daniels v. State*, 645 S.W.2d 459, 460 (Tex.Crim.App.1983). The record contains some evidence of ill will, but evidence of bad blood between the parties is not synonymous with sudden passion. *Williams v. State*, 768 S.W.2d 337, 339 (Tex.App.—Houston [14th Dist.] 1989, pet. ref'd). To support a charge of voluntary manslaughter, there must be some evidence of an *immediate* provocation which led to the homicide. *See Mason v. State*, 798 S.W.2d 854, 856 (Tex.App.—Houston [14th Dist.] 1990, no pet.).

Appellant testified he thought Coleman was going to get a gun out of the truck, and that Bates had a weapon in his pocket, and that he "debated" as to whether he should shoot Coleman or Bates. Appellant said he feared for his life and that he was "in quite a bit of [sic] state of shock." He further testified he had no intention of hurting anyone, and that both shots were intended only to "scare" Bates. This testimony shows a reflective and deliberate response to a perceived threat, not a spontaneous response to anger, rage, resentment, or terror. Appellant's second point of error is overruled.

■ Appellant contends in his third point of error that the trial court erred in failing to submit an instruction on the defense of property. Section 9.42 of the Penal Code authorizes the use of deadly force to protect property. Such force is authorized only to the degree the actor reasonably believes deadly force is immediately necessary to prevent another's imminent commission of arson, burglary, robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the nighttime. Appellant contends he was protecting property inside his home, not preventing Bates from picking up his rental car. Appellant's speculation that the victim *might* have intended to come back and rob him falls well short of satisfying the elements of defense of property. Bates had left appellant's home, and deadly force was not immediately necessary to prevent the victim's imminent commission of robbery or theft. Appellant's third point of error is overruled.

In his sixth point of error, appellant contends the trial court erred in refusing to admit testimony regarding extraneous acts of violence allegedly committed by Bates.[1] Ms. Lou Ann Martin was called as a witness for the defense. When she testified that Bates struck her several times in the face, the trial judge halted the proceedings *sua sponte*, and excused the jury. The judge asked Ms. Martin if she had ever told appellant or his girlfriend about this incident. Ms. Martin replied that she did not know appellant or Ms. Baggerly. The trial judge ruled that without first showing appellant was aware of the assault, Ms. Martin's testimony would be disallowed. The jury was recalled and in-

1. Appellant's brief does not contain a fourth point of error. His fifth point of error is merely an assertion that previous points of error were properly preserved for review. Because we have considered and rejected these points on the merits, we need not address appellant's preservation argument.

structed to disregard Ms. Martin's testimony. Appellant later testified Baggerly told him about Bates' assault on his ex-girlfriend's girlfriend. The trial court, however, did not permit Martin to be recalled in the jury's presence. Appellant contends the court erred in refusing to allow Martin to testify before the jury.

■ Pertinent evidence of the victim's character may, in some instances, be offered by an accused in a criminal case. TEX. R.CRIM.EVID. 404(a)(2). Here, such evidence was offered to help establish appellant's claim of self defense. In this context, Rule 404(a)(2) represents a codification of prior case law extending back at least as far as *Dempsey v. State*, 159 Tex.Crim. 602, 266 S.W.2d 875 (1954). *See Hernandez v. State*, 774 S.W.2d 319, 327 (Tex.App.—Dallas 1989, pet. ref'd); *Carrasquillo v. State*, 742 S.W.2d 104, 110 (Tex.App.—Fort Worth 1987, no pet.).

■ The *Dempsey* rule holds that in a murder case the victim's general reputation for violence, and specific acts of violent misconduct illustrating his dangerously aggressive character, are admissible in two respects to support a claim of self defense. *Dempsey*, 266 S.W.2d at 877–78. *See also Gutierrez v. State*, 764 S.W.2d 796, 798 (Tex.Crim.App. 1989). First, the victim's violent character may be used to show that he was the first aggressor. *Thompson v. State*, 659 S.W.2d 649, 653–54 (Tex.Crim.App.1983). Because the citizens of this state are authorized to use deadly force to protect themselves from another's unauthorized use of deadly force, the question of who fired first, or attempted to fire first, is frequently determinative of a defendant's claim of self defense. This is particularly true in cases where both parties are armed.[2]

■ Evidence of the victim's violent character may also be admissible to show the reasonableness of the defendant's apprehension of danger. *Thompson*, 659 S.W.2d at 653. In many cases, investigation conducted immediately after the homicide will reveal the decedent was unarmed. In these cases a defendant's claim of self defense must rest entirely upon a *perceived* danger. Such a perception is frequently based on a furtive gesture that can only be regarded as a threat when it is considered in light of the decedent's reputation for violence. Chief Justice Roberts reasoned: "If, then, the character of the assailant in any case has helped to form a reasonable belief in the mind of the assailed that his life was then in danger, when the acts alone would fail to do it, the jury should in some way be informed of the character of the assailant, as well as of his acts, to enable them to understand that the belief was a reasonable one." *Horbach v. State*, 43 Tex. 242, 251 (1875).[3]

■ When evidence of the victim's character is offered to show that he was the first aggressor, such evidence is admissible whether or not the defendant was aware of the victim's violent disposition. *Lowe v. State*, 612 S.W.2d 579, 581 (Tex.Crim.App. 1981); *Stone v. State*, 751 S.W.2d 579, 585 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd). However, if the evidence is offered to show the defendant killed the decedent because he reasonably believed his life to be in danger, the defendant must first establish that he was aware of the decedent's violent character. *Beecham v. State*, 580 S.W.2d 588, 590 (Tex.Crim.App.1979). His knowl-

---

2. In *Gonzales v. State*, 838 S.W.2d 848 (Tex. App.—Houston [1st Dist.] 1992), *pet. dism'd*, 864 S.W.2d 522 (Tex.Crim.App.1993), for example, both parties were armed, both parties fired their weapons, and both parties were hit by gunfire. In such cases the trier of fact must decide whether the defendant was the first aggressor or whether he was merely responding to unlawful aggression initiated by the deceased.

3. Justice Lumpkin, writing for the Supreme Court of Georgia, vividly illustrated the rationale: [H]as not the character of the deceased for violence, much to do in determining the rea-

sonableness or unreasonableness of the fear under which the defendant claims to have acted? ... We apprehend that the imminence of the danger, as well as the chances of escape, will depend greatly upon the temper and disposition of our foe. ... Who, knowing the character of Kyd the pirate, or of the infamous John A. Murrell, would not instantly, upon their approach armed with deadly weapons, act upon the presumption that robbery, or murder, or both, were contemplated?
*Monroe v. State*, 5 Ga. 85, 137 (1848).

edge of the deceased's aggressive nature may be from personal knowledge or from hearsay. *Dixon v. State*, 634 S.W.2d 855, 857 (Tex. Crim.App.1982). Appellant did not formally articulate a theory for the admission of Martin's testimony. But whether it was offered to show appellant's apprehension of danger or that Bates was the first aggressor, the trial court did not err in excluding it.

■■■ The credibility of appellant's testimony was seriously undermined by the physical evidence. However, even if we accept his testimony as true, the facts as related by appellant do not show an act of aggression by Bates that would justify appellant's use of deadly force. When appellant stepped onto his front porch, he was armed with a rifle. Bates had exhibited no weapon except a small wooden stake, and it had since been lost or dropped. Appellant says Bates thrust his right hand in his pants pocket when he reportedly told Coleman to get *the* gun. This statement, if true, implied that Bates was unarmed. Moreover, if appellant perceived a threat from Bates, that threat was greatly reduced after appellant fired the first shot. Rule 404 permits introduction only of evidence of the victim's *pertinent* character traits. *Patterson v. State*, 783 S.W.2d 268, 272 (Tex.App.—Houston [14th Dist.] 1989, pet. ref'd). Before a decedent's bad character is pertinent to show he was the first aggressor, the defendant must offer some evidence of aggression by the victim.[4] The only evidence of aggression by the deceased immediately preceding appellant's use of deadly force was that Bates had his hand in his pocket and was verbally threatening to kill appellant. Words alone do not constitute an act of aggression which would permit the use of deadly force. Neither can the placing of a hand in a pocket be considered an act of aggression. When considered together, these actions may foster an apprehension of danger which will support the use of deadly

force in self defense. Bates' alleged conduct does not, however, show an actual act of aggression authorizing admission of character evidence to show he was the first aggressor.

■■■ Evidence of a decedent's violent character is admissible to show the defendant's apprehension of danger only if the defendant knew of such evidence at the time of the homicide. Here, appellant said he was aware Bates had attacked Ms. Martin. This evidence was properly received without objection. Because appellant did not show he was aware of the additional details offered by Ms. Martin, her testimony was not admissible.

■■■ The State relies heavily on the harmless error rule. The exclusion of character evidence tending to show the deceased was the first aggressor is subject to a harmless error analysis. *See Carrasquillo*, 742 S.W.2d at 110–111. If Ms. Martin's testimony had been admissible, we agree that its exclusion would have been harmless in this case. The undisputed testimony of the medical examiner shows Bates was shot twice in the back. The citizens of this state are not so far removed from their western heritage that they do not still revile one who shoots another in the back. We believe there was little likelihood appellant's theory of self defense would have been favorably received even if the jury had been permitted to consider Ms. Martin's testimony. Appellant's sixth point of error is overruled.

In his final point of error, appellant contends the judgment should be reversed because one of the jurors failed to disclose during voir dire that he was the complainant in a criminal investigation. In voir dire, the State's attorney asked whether any member of the panel had ever experienced difficulty in getting a person to leave their home.

---

4. Professor Wigmore observes that before a defendant can offer evidence the deceased was the first aggressor, he must first show some act of aggression by the deceased:

> There ought, of course, to be some other appreciable evidence of the deceased's aggression, for the character evidence can hardly be of value unless there is otherwise a fair possibility of doubt on that point. Moreover, other-

wise the deceased's bad character is likely to be put forward to serve improperly as a mere excuse for the killing, under the pretext of evidencing his aggression, and it is often feasible to obtain untrustworthy character testimony for that purpose.

1A JOHN H. WIGMORE, EVIDENCE § 63, at 1367–68 (Tillers rev.1983) (footnote omitted).

**562**

Allen Crainer, a venireman, answered affirmatively and said he had called the police. During a recess in the trial, Juror Crainer was seen sitting in the coffee shop talking to Deputy Hatcherson of the Brazoria County Sheriff's Office. Hatcherson was not a witness in appellant's case. In an abundance of caution, however, the trial judge asked Crainer about the conversation with Hatcherson. Crainer explained that Hatcherson was a personal friend. He also said Hatcherson had been assigned to investigate a drive-by shooting at his home. Crainer stated that he had not discussed appellant's case with Hatcherson.

Appellant's counsel requested a mistrial on the theory that Mr. Crainer had withheld information regarding the drive-by shooting. Appellant's counsel claimed Crainer should have disclosed the incident when the State's attorney asked if any venireman had been the complainant in a criminal case. Appellant contends the trial court erred in overruling his request for a mistrial.

The voir dire process is designed to insure, to the fullest extent possible, that an intelligent, alert, disinterested, impartial, and truthful jury will perform the duty assigned to it. *Jones v. State,* 596 S.W.2d 134, 137 (Tex.Crim.App.1980). When a juror withholds material information, the parties are denied the opportunity to intelligently exercise their peremptory challenges. *Salazar v. State,* 562 S.W.2d 480, 482 (Tex.Crim.App.1978). However, unless defense counsel asks questions calculated to bring out information which might reveal an inability to be impartial, the material information which a juror fails to disclose is not really withheld. *Armstrong v. State,* 897 S.W.2d 361, 363–64 (Tex.Crim.App.1995).

Contrary to appellant's assertion, Crainer was never asked if he had been the complainant in a criminal case. Accordingly, appellant's seventh point of error is overruled. The judgment of the trial court is affirmed.