

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-12-00133-CR

JAMES NATHAN ALEXANDER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 40028-A

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

James Nathan Alexander appeals his conviction by a jury of the murder of Brian Barnett. Alexander admitted shooting Barnett but claimed he acted in self-defense and under the influence of sudden passion. The jury rejected Alexander's claim of self-defense and sudden passion and assessed punishment at thirty years' imprisonment and a $10,000.00 fine. The trial court sentenced Alexander consistent with the jury's assessment and ordered Alexander to pay $10,111.50 in court costs, including $9,647.50 for court-appointed counsel. Alexander argues that the evidence is legally and factually insufficient to support (1) the jury's rejection of self-defense, (2) the jury's rejection of sudden passion, and (3) the trial court's order that Alexander pay court costs.

We conclude that the evidence is sufficient to support the jury's rejection of self-defense and sudden passion but that the evidence is legally insufficient to support the trial court's order to pay court costs. We modify the judgment to delete the assessment of court costs and affirm the judgment, as modified.

## I.    The Evidence Is Legally Sufficient to Support Rejection of Self-Defense

Alexander claims the record establishes Barnett threatened him with deadly force. The State responds that the jury could have disbelieved Alexander's version of events.

Upon raising a defense to prosecution, such as self-defense, a defendant bears the burden of producing some evidence that supports the claimed defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Once the defendant produces such evidence, the burden then shifts to the State, which bears the

2

burden of persuasion "to disprove the raised defense." *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14. The burden of persuasion does not require the production of evidence, but it does require the State to persuade the jury beyond a reasonable doubt that the defendant did not act in self-defense. *Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008); *Zuliani*, 97 S.W.3d at 594. A jury verdict of guilt is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914.

"The *Jackson v. Virginia* legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (referring to *Jackson v. Virginia*, 443 U.S. 307 (1979)). Because the State carries the burden of persuasion to disprove self-defense beyond a reasonable doubt, we review a challenge to the sufficiency of the evidence supporting a jury's rejection of a claim of self-defense under the *Jackson* standard. *See id.*; *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Miranda v. State*, 350 S.W.3d 141, 147 (Tex. App.—San Antonio 2011, no pet.).[1]

In evaluating sufficiency of the evidence under the *Jackson* standard, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt.

---

[1]Alexander argues that he has the burden to prove self-defense by a preponderance of the evidence and that, consequently, we should use civil law standards in reviewing the factual sufficiency of the evidence. He cites to *Matlock v. State*, 392 S.W.3d 662, 673 (Tex. Crim. App. 2013), for this proposition. We agree that when a defendant has the burden to prove an affirmative defense by a preponderance of the evidence, *Matlock* would control. Self-defense, however, is not an affirmative defense. *Zuliani*, 97 S.W.3d at 594. Here, where the State ultimately must persuade the jury beyond a reasonable doubt that the defendant did not act in self-defense, the *Jackson* standard is the appropriate standard of review.

*Brooks*, 323 S.W.3d at 912 (citing *Jackson*, 443 U.S. at 319). We examine legal sufficiency under the direction of the *Brooks* opinion while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Self-defense justifies the use of deadly force if certain circumstances are met. *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). Under the Texas Penal Code, the use of deadly force is justified

> (1)    if the actor would be justified in using force against the other under Section 9.31; and
> (2)    when and to the degree the actor reasonably believes the deadly force is immediately necessary:
>     (A) to protect the actor against the other's use or attempted use of unlawful deadly force . . . .

TEX. PENAL CODE ANN. § 9.32(a) (West 2011). The use of force is justified under Section 9.31 "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."[2] TEX. PENAL CODE ANN. § 9.31(a) (West 2011).

It is undisputed that after completing work on July 20, 2010, Alexander drove to Barnett's recreational vehicle (RV) at Riverside RV Park where an argument developed between

---

[2]We note that there are exceptions under Section 9.31 of the Texas Penal Code, which include provocation and seeking a disagreement while unlawfully carrying a firearm. *See* TEX. PENAL CODE ANN. § 9.31(b) (West 2011). The record indicates that Alexander had a concealed handgun license. The State neither requested nor was the jury given any instruction on provocation.

Alexander and Barnett over rumors. The exact rumor, though, is disputed. Alexander, who used methamphetamines, testified Callie Bourn, with whom Alexander had romantic inclinations, told him that Barnett was claiming Alexander was a snitch for the Drug Enforcement Agency (DEA). Bourn and Felcio Groto, Alexander's former fiancé, testified that Alexander was angry because of a rumor that Groto had performed oral sex on Barnett. Text messages exchanged between Barnett and Groto contain references to both a possible sexual relationship and possible accusations of being a snitch.

Alexander testified that he asked Barnett, "[W]hat's the deal with the snitching and Callie?" According to Alexander, Barnett became angry, started talking about the rumored sex with Groto,[3] and eventually said, "'I'm going to end you; I'm going to smash [you].'" Alexander testified that because Barnett was normally a soft-spoken man and this behavior was unusual, he feared for his life. Alexander, who had a concealed handgun license, testified that while walking away from Barnett after this exchange, he (Alexander) pulled up his pant leg to reveal his gun. Alexander testified that he told Barnett, "You know -- Brian, you know I carry . . . Don't -- don't try to jump on me." According to Alexander, Barnett "ke[pt] basically saying, 'Hey, I'm going to end you. I'm going to smash you.'"

Alexander claimed that immediately after he got into his pickup but before he could put the keys in the ignition or close the door, Barnett grabbed his arm. Alexander was attempting to shut the driver's side door, and his arm was protruding through the open driver's side window. Alexander testified that even though his eyes were closed during this melee, he kept expecting to

---

[3]Alexander testified that he wanted to talk about Bourn but that Barnett kept talking about Groto.

5

be stabbed in the face because he "figured" that Barnett had a Leatherman[4] tool that had earlier been lying on a table and that Barnett would use it as a weapon. Alexander claims that as he was being pulled through the driver's side window, he drew his gun and shot Barnett. Alexander testified that he saw "something black" in Barnett's hand when this event occurred. After shooting Barnett, Alexander left the scene in his pickup, spinning his tires, and leaving some plastic trim from his bumper in a ditch. Shortly thereafter, Alexander admitted to shooting Barnett and claimed he "needed to go on the lam." When Alexander turned himself into the police, Alexander had two round bruises on his arm.

Alexander's description of bizarre behavior by Barnett was corroborated by Groto. According to Groto, Barnett had seemed stable earlier that day but "started acting strange and quirky again" at some point as evidenced by some text messages from Barnett to Groto accusing her of being a snitch. Groto testified that she had attempted to call Alexander to warn him.[5] Bourn testified that Barnett used methamphetamines and might be paranoid at times as a result of his drug use. Jacqueline Carpenter, a friend of Barnett, testified that Barnett had been unstable on the day of his death and described Barnett as a violent person. Several witnesses described Alexander as nonviolent.[6]

An autopsy revealed the presence of methamphetamine, trazodone, venlafaxine, oxycodone, amphetamine, ephedrine and norvenlafaxine in Barnett's blood. Trazodone and

---

[4]Cecil Shelton, an investigator with the Gregg County Sheriff's Department, testified that Leatherman is a brand name often used to refer generically to a multi-purpose folding tool that contains pliers and a knife blade.

[5]Groto was not sure whether she mentioned this warning to the police.

[6]Gillian Harris, a former girlfriend of Alexander's, testified that Alexander was a nonviolent person but admitted telling the police that Alexander was obsessed with her and had threatened her in the past.

6

venlafaxine are antidepressants, and oxycodone is a narcotic analgesic or "painkiller." Amphetamine and ephedrine are common byproducts of the body's metabolizing of methamphetamine, and norvenlafaxine is a byproduct of the metabolizing of venlafaxine. Although the volume of the prescription drugs found in Barnett's body were in the low therapeutic range and all of the illegal drugs were in the lower range, Dr. Nizam Peerwani, a medical examiner for the State of Texas, testified that due to the combination of both synergistic and antagonistic drugs, he was unable to predict whether or to what extent the drug levels in Barnett's body would have affected Barnett's behavior. Dr. Thomas Allen, the defense's expert, testified that the drug combination could cause unpredictable and aggressive behavior.

The reasonableness of a belief that deadly force is being threatened is measured by the objective standard of an ordinary and prudent man. *Echavarria v. State*, 362 S.W.3d 148, 154 (Tex. App.—San Antonio 2011, pet. ref'd). The police found the Leatherman still lying on a table and only a pair of gloves was found near Barnett's hand. Barnett was excluded as a contributor to the DNA on a knife found in the console of Alexander's truck. A rational jury could have concluded Alexander's belief that Barnett had a knife was not objectively reasonable.

Further, a rational juror could have disbelieved Alexander's tale of a physical confrontation with Barnett. Randy Richardson, a neighbor of Barnett's at the Riverside RV Park, testified that he and Barnett were talking when Alexander arrived, that Barnett and Alexander walked around to the other side of Barnett's RV, and that the next sound he heard was a gunshot. Richardson heard no yelling, screaming, or argument. Richardson and Ronda Walker, another neighbor of Barnett's, testified that Barnett did not appear to be on drugs a short

7

time before the shooting. Bourn testified that she had never known Barnett to be aggressive. Walker testified Barnett had been working on her air conditioning, did not seem agitated, and had carried on a normal conversation shortly before being shot.

The jury could have found that other portions of Alexander's testimony were not credible. Alexander testified he did not remember disposing of the gun. The State pointed out the incongruity of Alexander's ability to remember every second of Barnett's attack, on the one hand, and his inability to recall what happened to the gun, on the other. Jimmy Sheridan, a co-worker of Alexander's who had used methamphetamines with him at work, testified that Alexander appeared to be "tweaking or on crystal meth" shortly after the shooting.[7]

The jury was required to consider all evidence in deciding if Alexander reasonably believed that deadly force was immediately necessary to protect himself against unlawful deadly force by Barnett.

Alexander relies on the evidence that he thought Barnett had a knife-like weapon and was about to use it. Alexander's testimony on this point raises credibility issues. At one point, Alexander testified that his eyes were closed during the confrontation with Barnett, but when asked if Barnett had anything in his hand "while this was going on[,]" Alexander replied that Barnett had "something black in his hand." Alexander testified that he had earlier seen a "Leatherman" tool on a table and thought or assumed Barnett possessed it and intended to use it to inflict death. DNA testing excluded Barnett as a contributor to the DNA on a knife found in the console of Alexander's truck. No other witness testified that Barnett had a weapon prior to

---

[7]We note Richardson testified that Alexander did not appear to him to be on drugs.

this shooting. It was the jury's duty and prerogative to evaluate the evidence and judge its credibility. The jury's decision rejecting Alexander's claim of self-defense was one a rational juror could make when presented with the facts of this case. The evidence is sufficient to support the jury's rejection of self-defense, and Alexander's first point of error is overruled.

## II.  The Evidence Is Legally and Factually Sufficient to Support the Rejection of Sudden Passion

At the punishment phase of a murder trial, the defendant may seek to reduce punishment to that of a second degree felony by proving that he or she caused the death under the immediate influence of sudden passion with adequate cause. TEX. PENAL CODE ANN. § 19.02(d) (West 2011). "Sudden passion" is passion directly caused by and from provocation by the individual killed or a third party acting with the person killed that arises at the time of the offense and is not solely the result of former provocation. TEX. PENAL CODE ANN. § 19.02(a)(2) (West 2011). "Adequate cause" is any cause that would typically lead to anger, rage, resentment, or terror in a person of ordinary temperament, sufficient to render the mind incapable of cool reflection. TEX. PENAL CODE ANN. § 19.02(a)(1) (West 2011).

The sum and substance of Alexander's argument on the issue of sudden passion follows:

> It is the temporal relation between provocation and cause that is crucial in sudden passion analysis. That a jury would dismiss the actions of Brian Barnett in trying to pull Alexander out of his truck through the window of the passenger door as an inadequate cause of terror in Alexander's mind is simply not a reasonable verdict. The evidence preponderates in favor of sudden passion.

### A.  Legal Sufficiency

"A legal sufficiency challenge to the evidence supporting a negative finding on sudden passion involves two steps." *Bradshaw v. State*, 244 S.W.3d 490, 502 (Tex. App.—Texarkana

9

2007, pet. ref'd). First, we examine the record for evidence that supports the fact-finder's rejection of sudden passion, while ignoring all evidence to the contrary. *Id.* Second, if no evidence is found to support a rejection of sudden passion, then we examine the entire record to determine if it establishes the contrary proposition, i.e., whether it establishes sudden passion as a matter of law. *Id.* In reviewing the record, we show deference to the fact-finder's determination of the credibility of witnesses and the weight they gave to the evidence. *Cleveland v. State*, 177 S.W.3d 374, 388 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

Not all provocations support a finding of sudden passion. Sudden passion is not raised by "'a bare claim of' fear." *Wooten v. State*, No. PD-1437-12, 2013 Tex. Crim. App. LEXIS 824, at *13 (Tex. Crim. App. June 12, 2013) (quoting *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983)). An individual who fears for his or her life may still be capable of cool reflection. *See Fry v. State*, 915 S.W.2d 554, 559 (Tex. App.—Houston [14th Dist.] 1995, no pet.). For fear or anger to rise to the level of sudden passion, the defendant's mind must be rendered incapable of cool reflection and the words or deeds constituting provocation must have been adequate to induce such an emotional state in a man of ordinary temperament. *Wooten*, 2013 Tex. Crim. App. LEXIS 824, at **13–14.

Ignoring all evidence contrary to the jury's finding, there is sufficient evidence to support the jury's rejection of sudden passion. As noted above, a rational juror could have disbelieved Alexander's story and concluded there was no provocation by Barnett. Richardson heard no yelling, screaming, or arguing. Without provocation by Barnett, sudden passion has not been established.

Considering all of the evidence, Alexander did not establish sudden passion as a matter of law. Although Alexander testified he feared for his life, Alexander did not testify to such terror that he would have been incapable of cool reflection. A rational juror could have concluded that Barnett's words and attempt to pull Alexander out of his truck were not sufficient provocation to render an ordinary and prudent man incapable of cool reflection. The provocation must be sufficient to commonly produce such a passion in a person of ordinary temperament. *Wooten*, 2013 Tex. Crim. App. LEXIS 824, at **9–10; *Turner v. State*, 87 S.W.3d 111, 117–18 (Tex. Crim. App. 2002). A rational juror could have disbelieved Alexander or could have concluded Barnett's words and actions were insufficient to induce such passion in a person of ordinary temperament. The evidence is legally sufficient.

### B. Factual Sufficiency

As previously mentioned, a factual sufficiency review is still appropriate for affirmative defenses where the defendant has the burden of proof by a preponderance of the evidence. *See Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). A defendant bears the burden to prove sudden passion by a preponderance of the evidence. *Bradshaw*, 244 S.W.3d at 501. A factual sufficiency review is appropriate for sudden passion. *See De Leon v. State*, 373 S.W.3d 644, 650 (Tex. App.—San Antonio 2012, pet. ref'd); *Smith v. State*, 355 S.W.3d 138, 148 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

In a factual sufficiency review, the appellate court views all the evidence in a neutral light and determines whether the evidence supporting the verdict is too weak to support the finding of guilt beyond a reasonable doubt or if evidence contrary to the verdict is strong enough that the

11

beyond-a-reasonable-doubt standard could not have been met. *Matlock*, 392 S.W.3d at 671. A factual sufficiency review permits an appellate court to reweigh the evidence, albeit to a very limited degree. *See Tibbs v. Florida*, 457 U.S. 31, 41–42 (1982); *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006), *modified sub silencio by Brooks*, 323 S.W.3d at 912; *Meraz v. State*, 785 S.W.2d 146, 156 (Tex. Crim. App. 1990). Our factual sufficiency review is governed by the hypothetically correct jury charge. *See Grotti v. State*, 273 S.W.3d 273, 281 (Tex. Crim. App. 2008), *modified sub silencio by Brooks*, 323 S.W.3d at 912.

The evidence is factually sufficient. The record does not contain strong evidence of terror sufficient to create sudden passion. Even assuming Alexander's story was true, the great weight and preponderance of the evidence would not be contrary to a negative finding. At best, the record contains a death threat that placed Alexander in fear of his life. While a jury might infer terror sufficient for sudden passion from these facts, the circumstances do not require such an inference. As noted above, fear, alone, is not sufficient. Sudden passion requires terror to the extent the mind is incapable of cool reflection.

Furthermore, the record contains significant evidence that Alexander's story was not true. As noted above, Richardson, who was on the other side of the RV, heard no yelling, screaming, or arguing. None of the many neighbors in the RV park heard or saw anything unusual until the gunshot. There was evidence Alexander may have been on methamphetamines and that, as a result, his recollection of the events might not be entirely accurate. In summary, Alexander's story, even if believed in its entirety, is not sufficient to render the evidence factually insufficient, and the record contains ample justification for a jury to rationally disbelieve

Alexander's story. The jury's rejection of sudden passion is not against the great weight and preponderance of the evidence

The jury's rejection of sudden passion is supported by legally and factually sufficient evidence. Alexander's second issue is overruled.

**III.     The Evidence Is Legally Insufficient to Support an Assessment of Attorney's Fees**

Alexander's remaining complaint is that the trial court erred in ordering him to pay court costs. Alexander argues the total assessment of $10,111.50 was in error because a bill of costs had yet to be prepared at the time of the order. *See* TEX. CODE CRIM. PROC. ANN. art. 103.001 (West 2006) (court costs not payable until bill of costs produced or "ready to be produced"). In addition, Alexander argues the trial court erred in ordering payment of $9,647.50 for court-appointed attorney's fees because he was found to be indigent and nothing in the record demonstrates a change in Alexander's financial status.

The State argues the record contains evidence Alexander lied[8] in his request for court-appointed counsel[9] and, since he was released on bond, Alexander had the ability to earn money to pay for an attorney while awaiting trial.[10] The State also notes that the court-appointed counsel's billing records are contained in the appellate record.

---

[8]In his request for court-appointed counsel, Alexander states that he is unemployed, he has no income, and his only asset is a motorcycle. During Alexander's testimony at trial, Alexander testified that, at the time he was arrested, he had a job as a machinist and he owned a motorcycle, an RV, and a pickup truck with an "awesome system." Ryan Hailey, Alexander's brother-in-law and former boss, testified that Alexander continued to work for Hailey even after being arrested for murder and later voluntarily resigned.

[9]Gregg County has a boilerplate form for the request of court-appointed counsel that combines an affidavit of indigence, an order finding Alexander indigent, and the court-appointed attorney's request for reimbursement.

[10]The Texas Court of Criminal Appeals has held that "the defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and

The State's argument, though, ignores that a bill of costs is necessary to support the court costs award. "A cost is not payable by the person charged with the cost until a written bill is produced or is ready to be produced, containing the items of cost, signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost." *Id.* The record in this case does not contain a bill of costs.

Because a bill of costs is not newly created evidence, we have previously held that the appellate record can be supplemented with a bill of costs. *See, e.g.*, *Allen v. State*, No. 06-12-00166-CR, No. 06-12-00163-CR, 2013 Tex. App. LEXIS 4171 (Tex. App.—Texarkana Apr. 3, 2013, no pet.); *Hill v. State*, 2013 Tex. App. LEXIS 5060 (Tex. App.—Texarkana Apr. 24, 2013, no pet.) (mem. op., not designated for publication); *Jones v. State*, No. 06-12-00107-CR, 2013 Tex. App. LEXIS 2832 (Tex. App.—Texarkana Mar. 19, 2013, no pet.) (mem. op., not designated for publication).[11] Such a supplementation, while permissible because it does not introduce newly created evidence into the appellate record, is not necessary to a proper presentation of the case on appeal. Although we have authority under Rule 34.5(c) of the Texas Rules of Appellate Procedure to make sua sponte supplementation requests, we generally only use this authority when necessary for a proper presentation of the case. *See* TEX. R. APP. P. 34.5(c). A bill of costs is not required to be included in the appellate record and does not render the appellate record incomplete. The record has not been supplemented with a bill of costs.

---

fees." *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010) (reversing attorney's fees ordered as costs); *see* TEX. CODE CRIM. PROC. ANN. art 26.05(g) (West Supp. 2012). It is not necessary, though, for us to determine whether evidence of a prior ability to pay is evidence of an ability to pay at the time of trial.

[11]Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

Because the record does not contain a bill of costs, it is not necessary for us to decide whether the presumption of indigence prohibited the inclusion of attorney's fees in the assessment of court costs. In the absence of a bill of costs, the record does not support the order of court costs. *Johnson v. State*, 389 S.W.3d 513, 516 (Tex. App.—Houston [14th Dist.] 2012, pet. granted); *see Tafolla v. State*, No. 06-12-00122-CR, 2012 Tex. App. LEXIS 10555, at *1 (Tex. App.—Texarkana Dec. 20, 2012, pet. dism'd) (mem. op., not designated for publication); *Cuba v. State*, No. 06-12-00106-CR, 2012 Tex. App. LEXIS 10260, at **2–3 (Tex. App.—Texarkana Dec. 11, 2012, no pet.) (mem. op., not designated for publication). We delete the trial court's order of $10,111.50 as court costs.

## IV.    Conclusion

We modify the judgment to delete the assessment of $10,111.50 in court costs. In all other respects, we affirm the judgment of the trial court, as modified.

Jack Carter
Justice

Date Submitted:    July 29, 2013
Date Decided:    August 21, 2013

Do Not Publish

15