Rel: December 15, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2023-2024

_____

### SC-2023-0251

_____

## Ex parte Kendall Tewayne Johnson

## PETITION FOR WRIT OF MANDAMUS

## (In re: State of Alabama

## v.

## Kendall Tewayne Johnson)

## (Montgomery Circuit Court: CC-21-93)

MITCHELL, Justice.

This case arises from a shootout in a Montgomery neighborhood, in the aftermath of a heated argument between family members. The petitioner, Kendall Tewayne Johnson, exchanged fire with his uncle, Cedric Lee Hubbard, eventually striking Hubbard and killing him. A grand jury indicted Johnson for murder. But before the case could go to trial, Johnson filed a motion for self-defense immunity, arguing that Hubbard shot first and that he had returned fire only to defend himself and others from Hubbard's attack.

The prosecution opposed Johnson's motion but nonetheless stipulated that everyone who witnessed the shooting would testify that Hubbard had attacked first. The prosecution also did not submit any evidence suggesting that Johnson had attacked, menaced, or threatened Hubbard before the shootout, nor did it argue that additional discovery might reveal such evidence.

Despite the prosecution's stipulations, and despite the absence of any evidence that Johnson was the initial aggressor, the Montgomery Circuit Court denied Johnson's motion. That was error. Because the

2

stipulated facts clearly establish Johnson's entitlement to self-defense immunity, we grant his petition for a writ of mandamus.

<u>Facts and Procedural History</u>

After a grand jury indicted him for murder, Johnson filed a pretrial motion for immunity under § 13A-3-23(d), Ala. Code 1975, arguing that he shot Hubbard in self-defense. Johnson explained that he and his cousin, Ayindae Brown, had been outside Hubbard's house in Montgomery during the afternoon of May 12, 2019, when Hubbard -- who was drunk at the time -- pulled a gun on the two men and told them to leave. Ayindae turned his back to walk away, at which point Hubbard opened fire. It was only after Hubbard had begun firing, Johnson said, that he pulled out his own weapon and returned fire in defense of himself and his cousin.

The prosecution opposed Johnson's motion. It pointed out that Johnson did not have a valid permit for his firearm at the time of the shooting and argued that this unlawful action deprived Johnson of his eligibility for immunity under Alabama law.[1] The prosecution further

---

[1]The permitting requirement for concealed weapons has since been repealed. <u>See</u> Act No. 2022-133, § 9(2), Ala. Acts 2022.

argued that Johnson and Ayindae were "the initial aggressors because they came to [Hubbard's] residence to confront [Hubbard]" regarding an earlier family argument shortly before Hubbard started shooting at them.

Instead of hearing oral testimony on Johnson's motion, the trial court agreed to resolve the motion based on a series of factual stipulations jointly submitted by Johnson and the prosecution. Those stipulations provided as follows.

On Mother's Day in 2019, Hubbard got into a heated argument with Ayindae's mother, Latoya Brown, outside Hubbard's house in Montgomery. The argument was about money -- specifically, about a check belonging to Hubbard and Latoya's daughter, Shaliya Brown. Shaliya testified that her father, who had previously announced that "he was going to get drunk for Mother's Day," was intoxicated at the time. The argument between Hubbard and Latoya escalated until, at one point, Hubbard threatened to kill Latoya. Latoya then fled the house and called her adult son, Ayindae, to explain what had happened.

Later that afternoon, Ayindae and Johnson stopped by Hubbard's house so that Ayindae could "talk to Shaliya about the argument." The

4

two men were accompanied by Ayindae's girlfriend -- a young woman named Ventrelya Smith -- and her baby daughter. As soon as Ayindae and Johnson stepped out of their vehicle, Hubbard -- who had been visiting with his neighbor, Michael Robinson, at Robinson's house -- "came from across the street," walked up to the two men, and demanded to know what Ayindae's "problem" was. Ayindae responded by asking whether it was true that Hubbard had threatened to shoot his mother. Hubbard answered that it was true and then told Ayindae to leave.

Apart from Hubbard and Johnson, there were six people in the area who witnessed all or part of what transpired next: Shaliya, Dekerria Johnson (Shaliya's half sister and Hubbard's stepdaughter), Dezi Jefferson (the daughters' mutual friend), Robinson, Ayindae, and Smith.

Only four of those six people -- Dekerria, Jefferson, Ayindae, and Smith -- witnessed how the shooting began. All four of them stated, without contradiction, that Ayindae tried to walk away after Hubbard told him to leave but that, as soon as Ayindae "turned to go back to his vehicle, Hubbard fired a weapon in [Ayindae and Johnson's] direction." Johnson then pulled out his own weapon and "returned fire," hitting and ultimately killing Hubbard.

5

Every witness who saw the beginning of the shooting also agreed that Johnson had been on the sidelines, standing by Ayindae's car -- which was parked across from Hubbard's house -- at the time Hubbard began firing. Several witnesses also stated (again without contradiction) that Hubbard was drunk at the time and that he had armed himself with two firearms, "a big gun" and "a little gun," before approaching Ayindae.

Finally, every witness who was present that day indicated that they saw Ayindae and Johnson running away or attempting to take cover while Hubbard was shooting. Hubbard's friend and neighbor, Robinson, said that he saw Hubbard chasing Ayindae and Johnson "into the street while shooting" at them, even though the two men were "backing up" and away from Hubbard at the time. Hubbard's stepdaughter, Dekerria, told police that Hubbard began firing at Ayindae after Ayindae had "turned to leave." Ayindae and Smith each told police that Ayindae had already "turned to walk back to [his] car when [Hubbard] began shooting" at him. Jefferson stated that, while she did not see how the shooting began, she did see Ayindae and Johnson "running away." And Hubbard's daughter, Shaliya, who also did not see how the shooting began, said that when she looked outside, she saw "Hubbard in the street shooting" while Johnson

was "across the street," trying to shield himself "behind a tree," while returning Hubbard's fire.

One of Johnson's bullets eventually struck Hubbard in the chest, killing him. After Hubbard stopped shooting, Johnson and Ayindae fled. None of Hubbard's bullets struck Johnson or Ayindae, though Dekerria and Jefferson both testified that one of Hubbard's stray bullets did "hit [an unnamed mutual] friend on the side of her leg" and that the friend had to be taken to the hospital for treatment.

Police eventually recovered several bullets from the scene, including six .40-caliber casings, which came from Johnson's pistol, and eight .45-caliber casings from another gun. The gun that fired the .45-caliber casings -- which presumably was the "big gun" that witnesses described Hubbard as carrying -- was never recovered. The police did recover Hubbard's small gun, "a 0.25 caliber weapon," but did not recover any .25-caliber casings from the scene (though it is unclear from the record whether Hubbard's .25-caliber weapon was the type of gun capable of ejecting shell casings). Johnson conceded that he did not have "a legally valid pistol permit."

After reviewing these stipulated facts, the trial court denied Johnson's request for self-defense immunity in a one-paragraph order, which stated that, based on its review of "the facts as stipulated by the parties," Johnson was ineligible for self-defense immunity because: (1) Johnson and Ayindae were the initial aggressors; (2) Johnson was required to retreat from the altercation because he had engaged in illegal activity by carrying his pistol without a permit; and (3) the fact that Johnson was carrying a pistol without a permit was "prima facie evidence of his intent to commit the murder."

Johnson filed a petition for a writ of mandamus in the Court of Criminal Appeals, which denied his petition in a per curiam opinion, over the dissent of two judges. See Ex parte Johnson, [Ms. CR-21-0117, Mar. 24, 2023] ___ So. 3d ____ (Ala. Crim. App. 2023). Johnson then sought mandamus review in this court, in accordance with Rule 21, Ala. R. App. P. We ordered an answer and briefs.

## Standard of Review

We review de novo a decision of the Court of Criminal Appeals on an original petition for a writ of mandamus. Rule 21(e)(1), Ala. R. App. P.; Ex parte Sharp, 893 So. 2d 571, 573 (Ala. 2003). Mandamus relief is

appropriate when "'"the petitioner can show (1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court."'" State v. Jones, 13 So. 3d 915, 919 (Ala. 2008) (citations omitted).

In determining whether the petitioner has satisfied that standard, "this Court reviews issues of law de novo." Ex parte Terry, 957 So. 2d 455, 457 (Ala. 2006). Accordingly, when "'"the facts before the trial court are essentially undisputed"'" -- as they are in cases such as this one, in which no oral testimony was heard and the only evidence before the trial court was a set of stipulated facts -- "'"the court's judgment carries no presumption of correctness."'" Id. (citations omitted).

## Analysis

Alabama law generally allows a person to use "deadly physical force" against another to defend himself or a third person when he "reasonably believes" that the other person is "[u]sing or about to use unlawful deadly physical force." § 13A-3-23(a)(1). But there are some important exceptions to that rule. As relevant here, a person is not justified in using physical force to defend himself or a third person if

9

"He or she was the initial aggressor, except that his or her use of physical force upon another person under the circumstances is justifiable if he or she withdraws from the encounter and effectively communicates to the other person his or her intent to do so, but the latter person nevertheless continues or threatens the use of unlawful physical force."

§ 13A-3-23(c)(2).

At common law, the victim of a violent attack was required to make a reasonable attempt to retreat, if retreat was feasible, before using deadly force against his attacker. Hill v. State, 194 Ala. 11, 26, 69 So. 941, 947 (1915). But our self-defense statute modifies that common-law rule, giving any victim the right to "stand his or her ground" and refuse to retreat, so long as the victim is otherwise justified in using physical force under § 13A-3-23(a), is "not engaged in an unlawful activity," and is in a "place where he or she ha[s] the right to be." § 13A-3-23(b).

Our self-defense statute also provides a procedural safe harbor for victims of violent crime, allowing anyone who claims that he was justified in defending himself -- either under the common-law approach or under the stand-your-ground protection conferred by the Legislature -- to seek immunity from criminal prosecution by filing a pretrial motion under subsection (d). A defendant who files a pretrial immunity motion carries the burden of demonstrating "by a preponderance of the evidence that he

or she is immune from criminal prosecution." § 13A-3-23(d)(2). But if a defendant does not meet his burden of proving his entitlement to self-defense immunity at the pretrial hearing, he may nonetheless pursue the defense at trial, at which point the prosecution bears the burden of proving that he did <u>not</u> act in defense of himself or others, along with all the other elements of murder. § 13A-3-23(d)(4); <u>Ex parte Johnson</u>, 433 So. 2d 479, 481 (Ala. 1983).

As noted above, the trial court provided three justifications for its determination that Johnson was ineligible for self-defense immunity. First, it held that Johnson was an "initial aggressor" and was therefore barred from invoking self-defense immunity under subsection (c). Second, it held that Johnson was required to retreat from the altercation because he had engaged in an "illegal activity" by carrying his pistol without a permit. Finally, the trial court held that Johnson's decision to carry a pistol without a permit was "prima facie evidence of his intent to commit the murder." We address each of those holdings in turn.

### A. Johnson was not the "initial aggressor"

Everyone seems to agree that Johnson satisfies the baseline requirements set out in § 13A-3-23(a)(1) to be eligible for self-defense

immunity. At the time Johnson killed Hubbard, Hubbard was actively firing at Johnson and his cousin. Johnson, therefore, "reasonably believe[d]" that Hubbard was "[u]sing or about to use unlawful deadly physical force" against him or another person. § 13A-3-23(a)(1).

But the trial court determined that Johnson was ineligible for self-defense immunity based on the carveout in subsection (c)(2) because, it reasoned, Johnson "was one member of a group that initiated the aggression" against Hubbard. In other words, the trial court concluded that Ayindae's decision to verbally confront Hubbard about Hubbard's threats against Ayindae's mother was an act of initial aggression and that Johnson had participated in that aggression by accompanying Ayindae during his visit to Hubbard's house.

The trial court's conclusion reflects a mistaken understanding of what constitutes "initial aggress[ion]" under § 13A-3-23(c)(2). While a person who starts an argument might be said to have behaved "aggressively" in a loose sense of that word, the term carries a more precise meaning in criminal law. In that context, as the Court of Criminal Appeals has elsewhere explained, the term "initial aggressor" refers to someone who engaged in a "'<u>forceful</u> action or procedure,'" as in

12

an "'unprovoked attack,'" against another; it does not encompass someone who simply "created [a] controversy" or verbally confronted someone else. Gaines v. State, 137 So. 3d 357, 361 (Ala. Crim. App. 2013) (citing Merriam-Webster's Collegiate Dictionary 272 (11th ed. 2003) (defining "aggression")) (emphasis added). We agree with the court in Gaines -- and with the numerous courts in other jurisdictions that have considered this question[2] -- that an individual does not forfeit his right to defend himself and others merely by starting an argument (or, in

---

[2]See, e.g., State v. Kee, 6 Wash. App. 2d 874, 881, 431 P.3d 1080, 1083 (2018) ("words are not adequate provocation to negate self-defense" (citing State v. Riley, 137 Wash. 2d 904, 911, 976 P.2d 624, 628 (1999))); Castillo v. People, 421 P.3d 1141, 1150 (Colo. 2018) ("insults alone cannot make one the initial aggressor"); Commonwealth v. Grassie, 476 Mass. 202, 210 n.7, 65 N.E.3d 1199, 1206 n.7 (2017) ("words alone cannot make one into a first aggressor"); State v. Buckley, 202 Vt. 371, 384, 149 A.3d 928, 936 (2016) ("'mere words do not justify an assault and battery'" (citation omitted)); State v. Jones, 320 Conn. 22, 59, 128 A.3d 431, 455 (2015) ("as a matter of law, the jury could not have determined that [the defendant] was the initial aggressor solely on the basis of his utterance of certain words"); In re Mondy E., 121 A.D.3d 785, 786, 994 N.Y.S.2d 173, 175 (2014) ("[a]n actor is not the initial aggressor where his or her conduct consists of 'mere insults as opposed to threats'" (citation omitted)); Drennen v. State, 311 P.3d 116, 129 (Wyo. 2013) ("words alone do not make a person the aggressor"); Jones v. State, 201 P.3d 869, 886 (Okla. 2009) ("the use of words alone cannot make a person an aggressor"); Salas v. State, No. 14-98-01319-CR, Jan. 11, 2001 (Tex. App. 2001) ("verbal insults" and "'[w]ords alone do not constitute an act of aggression which would permit the use of deadly force'" (quoting Fry v. State, 915 S.W.2d 554, 561 (Tex. App. 1995))).

Johnson's case, providing moral support to the person who allegedly started an argument).

Perhaps recognizing the trial court's error, the State's brief attempts to justify the trial court's "initial aggressor" determination on an alternate basis. The State hypothesizes that the trial court might have refused to credit the unanimous witness testimony that Hubbard attacked first. And absent that witness testimony, the State argues, the trial court could have concluded that it was plausible that Johnson -- not Hubbard -- shot first, and thus that Johnson really was the initial aggressor.

There are multiple problems with this argument. The first and most obvious is that the State's theory is inconsistent with the trial court's own order. In that order, the trial court explained that it based its ruling on "the facts as stipulated by the parties[] and the argument[s] of counsel," which would be an unusual thing to say if the trial court had actually refused to credit those stipulations and rejected the arguments of counsel. Indeed, everything about the trial court's order indicates that -- in keeping with the approach urged by the prosecution -- it treated the stipulated facts and testimony as true but reasoned that, "regardless of

14

which individual shot first, [Johnson] -- and frankly, [Ayindae], too -- were the initial aggressors because they came to [Hubbard's] house to confront [Hubbard] following the earlier argument [Hubbard] had with [Ayindae]'s mother." In other words, the trial court determined that Johnson was the initial aggressor because he had accompanied the person who started a verbal argument with Hubbard, not because it determined that he had shot first.

A second problem with the State's theory is that the State provides no plausible explanation for why the trial court would have refused to credit the uncontradicted testimony of so many witnesses.[3] That testimony was unanimous on every relevant detail, consistent with the

---

[3]The closest the State comes is when it points out -- in an attempt to cast doubt on the truthfulness of their testimony -- that some of the witnesses in this case were related to Johnson. We do not see why that matters. After all, every witness who was related to Johnson was also related at least as closely to Hubbard. And the testimony of all the individuals who were related to Johnson and Hubbard was consistent with the testimony of the three individuals who bore no relation to either man (Smith, Jefferson, and Robinson). Indeed, even the witness who was most clearly partial to Hubbard -- Robinson, who was Hubbard's longtime friend and neighbor and who did not know Johnson or Ayindae at all -- testified that Johnson and Ayindae were trying to back away while Hubbard was firing at them.

physical evidence, and unimpeached by the prosecution, and it contained no apparent indications of partiality or dishonesty.

We do not doubt that there may be circumstances in which a trial court could properly decline to credit stipulated testimony -- such as if the stipulations are incoherent, inconsistent, contradicted by physical evidence, or appear to be the product of collusive activity or witness intimidation. But none of those circumstances are present in this case. Here, the testimony of all the witnesses was cogent, unanimous, and consistent with all the other evidence. There was nothing in the parties' stipulations that could have led a reasonable fact-finder to determine that Johnson shot first, and nothing about the trial court's order indicates that it made such a determination.

B. To the extent the common-law duty to retreat applied, Johnson satisfied that duty

The second reason the trial court gave for denying Johnson's pretrial immunity motion had to do with Johnson's failure to obtain a valid permit for his pistol. According to the trial court, that failure meant that Johnson was "engaged in an unlawful activity" under § 13A-3-23(b) and was thus ineligible for Alabama's statutory stand-your-ground

16

protections. Consequently, the court concluded, Johnson was "required to retreat from the altercation."

We note at the outset that the law requiring gun owners to obtain a permit before carrying a concealed weapon, § 13A-11-73, Ala. Code 1975, was repealed by the Legislature shortly after Johnson's indictment, see Act No. 2022-133, § 9(2), Ala. Acts 2022, amidst a nationwide spate of litigation challenging permitting restrictions on the right to keep and bear arms, see, e.g., New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 12-15 (2022). Johnson argues that the repeal of § 13A-11-73 operates retroactively, such that he was not "engaged in an unlawful activity" at the time of the shooting after all. The State does not respond to this argument in its briefing.

We need not address either the constitutional validity of the old gun-permitting regime or the retroactive effect of its repeal in order to decide this case. Even if we assume that Johnson was required to comply with the common-law duty to make a reasonable attempt at retreat, the materials before this Court show that he satisfied that duty. As noted above, everyone who saw how the shootout began indicated that Ayindae -- and by all indications, Johnson too -- were already retreating when an

17

intoxicated Hubbard started shooting at them. In addition, when Hubbard started firing, Johnson and Ayindae were on foot in the middle of a street in a residential neighborhood, surrounded by innocent bystanders (including Smith's small child) and their homes. Such a situation simply does not leave "open to [the victims] a reasonably safe mode" of retreat, Oldacre v. State, 196 Ala. 690, 693, 72 So. 303, 304 (1916), meaning that -- even under the common-law standard -- Johnson was entitled to defend himself and others.

C. Johnson's possession of a pistol without a license does not preclude him from self-defense immunity

The trial court's third and final justification for its ruling rested on its view that Johnson's possession of a pistol without a permit was "prima facie evidence of his intent to commit the murder." That statement appears to borrow language from an earlier version of § 13A-11-71, Ala. Code 1975, which -- at the time Johnson was indicted -- provided that, "[i]n the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol and had no license to carry the same shall be prima facie evidence of his intention to commit said crime of violence." In 2022, the Legislature rewrote the statute to

remove the relevant language, consistent with its decision to repeal the permitting requirement outright. See Act No. 2022-133, § 1.

As above, we need not comment on the validity of earlier versions of § 13A-11-71 or on the retroactive effects of its amendment, because even under the old permitting regime, it was well established that § 13A-11-71's presumption had no relevance once "self-defense ha[d] been injected as a defense." Manuel v. State, 711 So. 2d 507, 513 (Ala. Crim. App. 1997) (citing In re Winship, 397 U.S. 358, 364 (1970)). That is because, as the dissenting opinion below pointed out, defense of self and others is available without regard to whether the defendant intended to kill (as opposed to merely wound or repel) his attacker. See Ex parte Johnson, ___ So. 3d at ____ (Cole, J., dissenting). Even if a defendant admits that he intended to kill his attacker, Alabama law still shields him from criminal liability so long as his use of force was reasonably necessary to defend himself or another person from the attacker's initial aggression. See § 13A-3-23; Hill, 194 Ala. at 26, 69 So. at 947. Former

19

§ 13A-11-71 therefore does not prevent Johnson from claiming self-defense immunity,[4] and the trial court erred in concluding otherwise.

## Conclusion

For the reasons stated above, we grant Johnson's petition for a writ of mandamus and direct the trial court to grant his motion for self-defense immunity.

PETITION GRANTED; WRIT ISSUED.

Parker, C.J., and Shaw, Wise, Bryan, Mendheim, Stewart, and Cook, JJ., concur.

Sellers, J., concurs in the result.

---

[4]The State appears to recognize this reality, because it does not even attempt to defend this aspect of the trial court's holding in its briefing before this Court.