**Affirmed and Opinion filed February 25, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-20-00010-CR

**FRANK E. SEIDULE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 239th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 85423-CR**

## O P I N I O N

Appellant Frank E. Seidule appeals his murder conviction. He raises two issues, both of which seek a new trial based on alleged error in the admission or exclusion of evidence during the guilt/innocence phase of trial. In his first issue, appellant contends the trial court erred by excluding specific acts of violence or misconduct by the decedent, which appellant asserts was admissible in connection with his self-defense claim. In his second issue, appellant argues that the trial court

erred by admitting opinion evidence of appellant's violent character. Concluding that both complaints lack merit, we affirm the judgment.

## Background

A grand jury indicted appellant for the murder of Lewis Watson. Appellant admitted killing Watson but claimed that he shot Watson in self-defense. The following evidence was presented at appellant's jury trial.

Appellant, Paula Cerda (appellant's girlfriend), and Watson all lived in a single residence. On November 7, 2017, appellant called the Brazoria County Sheriff's Office ("BCSO") on a nonemergency line. He told the dispatcher that he shot Watson with a 9-millimeter handgun and "had to kill [him] because [Watson] kept threatening to kill me." Appellant stated that Watson threatened to kill him numerous times, including during the preceding week when Watson threatened to kill him with a sawed-off shotgun. He added that Watson assaulted him in 2010 and shot a gun into his television and windows. Appellant also told the dispatcher that Watson may have an active warrant for his arrest for failing to fulfill the terms of his probation. Appellant said that he phoned his lawyer before calling the BCSO.

BCSO deputies, including Deputy John McDonald, were dispatched to appellant's home, where they discovered Watson's body in the kitchen pantry covered by a plastic tarp and a trash bag. Appellant asserted that Watson threatened to kill him and pointed a shotgun at his face. Appellant mentioned several incidents during the preceding few days when Watson physically assaulted him. Additionally, appellant told Deputy McDonald, as he had told the dispatcher, about an assault in 2010 and that Watson was recently released from jail on probation. Deputy McDonald took pictures documenting several bruises on appellant's person, and appellant was transported to a local hospital.

BCSO Investigator Dominic Sanders interviewed appellant twice at the hospital. During the first brief recorded interview, appellant related that he had been kicked in the ribs and that his ankle and left arm had been "messed up." Appellant's medical records indicated these injuries occurred two to five days earlier.

During a second and longer recorded interview, appellant described his history with Watson. Appellant had known Watson since around 2003. Watson frequently worked for appellant in appellant's landscaping business. Appellant explained that Watson assaulted him in 2010, but the two reconciled and Watson moved into appellant's home after being released from prison for a different offense. Appellant said that Watson became increasingly aggressive towards appellant after moving in. For example, Watson pushed him around "a lot" and kicked him in the side "a couple of days" before the shooting. And just one day before the shooting, appellant left the house because Watson became "violent" toward him. While appellant was away, Watson fired a shotgun into the television and through a window.

Appellant also told Investigator Sanders his version of events the night of Watson's death. During a confrontation about Watson shooting the television and the window, Watson threatened to kill appellant while pointing a shotgun at him. Appellant went to his bedroom, retrieved his handgun, and returned. Appellant saw Watson standing at the kitchen sink, no longer holding the shotgun. According to appellant, he intentionally shot Watson, first in the "butt" and then again as Watson turned and "came after" him. Appellant fired again as Watson turned toward the back door. After Watson fell by the pantry, appellant shot him a final time in the head. Appellant called both his lawyer and his father, reaching only the latter, who told him to call the police.

3

Following both hospital interviews, Investigator Sanders obtained a search warrant for appellant's home. BCSO officers discovered a shotgun on the highest shelf in the kitchen pantry behind several dusty liquor bottles, as well as a fully loaded 9-millimeter handgun in a holster in a downstairs bedroom. Officers found no firearms at or within reach of Watson's body. Numerous shell casings and bullet fragments were collected.

Investigator Sanders interviewed appellant a third and final time, with counsel, in March 2018. During this recorded interview, appellant described for the first time a physical assault by Watson shortly before the shooting. Appellant said that Watson "sucker-punched" him after an argument; when appellant fell to the ground, Watson continued beating and kicking him. Cerda attempted to intervene, Watson hit her in her eye, and she fell backwards. Appellant claimed that Cerda had four broken ribs and a black eye. Appellant had not mentioned these facts during his prior statements to the dispatcher, Deputy McDonald, or Investigator Sanders. Appellant left the room to retrieve his 9-millimeter handgun, loaded the gun, returned to the kitchen, and shot Watson as Watson stood by the sink. Appellant claimed that Watson came toward him before turning to the back door, and he continued to shoot at Watson. According to appellant, Watson said he was getting his shotgun as he moved toward the kitchen pantry. Appellant stated that he saw Watson reach for something in the pantry before shooting him again. Cerda was no longer in the kitchen at that time, and appellant assumed that she was in her bedroom. Appellant repeatedly stated that he feared for both his and Cerda's lives when he shot Watson. Finally, appellant claimed that his leg had been broken from the assault and that he needed surgery for his eye where Watson hit him.

Cerda testified that on the evening of the shooting, she, Watson, and appellant were talking and drinking alcohol. She and appellant had "quite a few" beers, and

4

Watson was drinking a large glass of whiskey. Cerda went to her bedroom. Later, she heard appellant tell Watson that "you really need to get your priorities and get your probation and [your] community service done," which Watson supposedly was not doing. She heard a "commotion" in the kitchen and returned to find Watson on top of appellant, hitting him. She tried to pull Watson off, but Watson struck her and she fell backward. When she got up, appellant was no longer in the kitchen. Watson said he was not "after" her. She saw Watson in the pantry, looking for something on a shelf behind the garbage can. Cerda returned to her bedroom, took some allergy medication, and went to sleep. Before she fell asleep, she heard gunshots but assumed that Watson was shooting rounds into the backyard as he had done before. Appellant later woke her and showed her Watson's lifeless body, surrounded by "a lot" of blood. Cerda and appellant placed a plastic sheet over Watson's body, and she told appellant to call police. On cross-examination, Cerda testified that, during the month before the shooting, Watson sawed off the barrel of a shotgun, over appellant's protestation. Watson carried the shotgun around the house and frequently shot it outdoors. Approximately one week before the offense, Watson came to Cerda's room looking for appellant, and shot out a window when he did not find him.

The medical examiner who performed Watson's autopsy testified. He described six bullet entry wounds to the back of his torso, legs, and arms. One bullet perforated Watson's iliac artery and another fractured his femur. Watson had a seventh bullet entry wound on his head. The six gunshots to Watson's body may have been survivable with prompt medical attention, and it was possible that a person suffering from these types of wounds could still remain a threat and, if armed, pull a trigger. However, the gunshot to Watson's head would have caused immediate death. Toxicology analysis of Watson's blood showed his blood-alcohol content

5

was 0.123. Watson also had metabolites of diazepam, marijuana, and an anti-depressant in his system at the time of his death. Contrary to appellant's statements to Sanders, the medical examiner said there were no bullet entry wounds to the front of Watson's body.

## A.    Appellant's Character

The critical evidence for our purposes involves two topics: appellant's character and Watson's character. The subject testimony regarding appellant's character came from two witnesses, Codi Craddock and Bryan Cupp. Before either witness testified, the court ruled preliminarily outside the jury's presence that it would not allow testimony of specific instances of conduct by appellant or Watson but would allow reputation or opinion testimony. At that point, appellant stated his objection under rule 404 to evidence of appellant's reputation for violence. The jury returned to the courtroom, and the State called Craddock.

*Codi Craddock*. The State sought to introduce character evidence regarding appellant's propensity for violence from Craddock, the daughter of appellant's former wife. Craddock has known appellant since approximately 1994. Craddock testified that, in 2017 when she visited appellant, he and Watson seemed to be "close" and "friends." She never saw physical fights or arguments between them. She also stated that she had seen appellant with a gun at his house during the 2017 timeframe. The prosecutor then asked whether she had an opinion about whether appellant can be violent, and Craddock said "yes." When asked to state her opinion, appellant reiterated his rule 404 objection, which the court overruled. Craddock testified that, in her opinion, appellant could be and had been violent. In contrast, she described Watson as "easygoing" and "trustworthy."

*Bryan Cupp*. Lisa Good, a friend of Cerda's who also knew appellant and Watson, described a conversation she had with appellant, Cerda, and another

6

individual, Bryan Cupp, in September 2018. Good recorded this conversation on her cell phone intending to provide it to BCSO investigators, which she did. The State played the recording for the jury. On the recording, appellant asked Good if she wanted to "get rid of" her estranged husband by setting him up with heroin in an effort to send him to prison. Good said that she did not want to do that, and appellant suggested that he could do the same thing to Good's husband as he had done to Watson, making a pistol-shaped hand gesture and simulating the sound of a gunshot.

Later, during the defense's case-in-chief, appellant called Cupp to testify regarding the conversation Good recorded. Cupp acknowledged that one reason for the recording was because he and Good "knew [appellant] had killed [Watson] and that wasn't right." Cupp agreed that the recording was made to give to the police. On cross-examination, the prosecutor asked whether he had an opinion whether appellant is violent. Restating his rule 404 objection, appellant asserted that the solicited opinion testimony could only be offered in rebuttal after the defense had offered evidence of appellant's peaceful character, which it had not presented. The trial court overruled appellant's objection. Cupp then stated his opinion that appellant was violent.

## B.  Watson's Character

The relevant testimony pertaining to Watson's character came from two defense witnesses, Manna Moore and Michael Lochmann. Appellant proffered character testimony from both witnesses to buttress his self-defense theory and show that Watson was the first aggressor and that appellant reasonably feared for his life at the moment of the shooting. Appellant asserted that Moore and Lochmann would describe specific acts of violence by Watson that were admissible to establish "a long-term character of the victim for violence and unpredictable behavior." The trial court heard the relevant testimony outside the jury's presence.

7

*Manna Moore*.  Moore was in a relationship with Watson from 2003 to 2008, during which Watson was unpredictably violent, was a paranoid schizophrenic with delusional beliefs, used drugs and alcohol, and was obsessive and controlling toward her.  She described an occasion when Watson locked her out of the house.  After she banged on the door for two hours, Watson finally answered, naked and wielding a machete.  According to Moore, Watson destroyed items in the house and had delusions that a neighbor worked for the FBI, which caused her concern that Watson would kill the neighbor.  She stated Watson "always" possessed a loaded gun.  She testified that Watson had frequently beaten her, and he would not let her leave the relationship.  Watson regularly threatened her and her family, and she saw him be physically violent with his mother.  Moore described an occasion when Watson became upset at appellant and "went nuts" in front of appellant, throwing equipment and screaming.  According to Moore, Watson and appellant almost got into a "fist fight."  Moore testified that Watson physically assaulted her and threatened her with a knife in 2007 or 2008, which caused her to end their relationship.  However, up until six months before his death, Watson continued to track her down and contact her.

*Michael Lochmann*.  Lochmann, whose wife had been in an eight-month relationship with Watson before Lochmann began dating her, described Watson's stalking behavior.  He stated that Watson attempted to contact him and his wife repeatedly by phone and email.  Lochmann spoke to appellant about Watson before Watson's death:  "I told [appellant] that Lewis [Watson] was stalking me and my then girlfriend, that he was dangerous, that he was making threats against me and my girlfriend Nicole at the time, and that he had threatened to kill me."  He explained that his wife's brother caught Watson breaking into her brother's house.  As well, his wife's father, who was an IRS employee, related that Watson accessed a secured

8

floor at an IRS building before being confronted by security. On cross-examination, Lochmann acknowledged that he was not present for either of these incidents and that his wife told him about them. Lochmann also described occasions when Watson followed him. According to Lochmann, Watson's words and actions placed both he and his wife in fear for their lives.

*Ruling*. The State opposed the admission of Moore's testimony on the ground that any probative value was substantially outweighed by the danger of unfair prejudice due to the remoteness of the described behavior. As to Lochmann's testimony, the State argued that it was not probative of whether Watson was the "first aggressor." The trial court ruled:

> Let me start with Ms. Moore. Obviously I'm going to allow her to testify as to what her relationship was with Mr. Watson as far as how she knew him. I'll allow her to testify as to character and opinion of Mr. Watson because I believe she can do that. The predicate's been laid.

> I'm not going to allow her to give any type of expert testimony. I don't think she's been proven up as an expert when she starts talking about brain chemical makeup. . . .

> And even any type of diagnosis as far as obsessive behavior -- well, general obsessive behavior, I mean, that's fine, I mean, I guess as to their relationship. As to any specific instances of conduct, I'm not going to allow her to go into that regarding the machete or those things that she talked about.

> I am going to allow her to testify as to the incidents that [appellant] observed where she was there because I believe if [appellant] was there, then obviously then that is -- that's relevant as to his state of mind. But as to any specific instances of conduct, I'm not going to allow her to testify.

> As to Mr. Lochmann, I'll allow him to testify as to general reputation and opinion and the fact that he -- that he prior to Mr. Watson's death informed [appellant] of what his opinion is and a general basis.

9

As to anything else that Mr. Lochmann testified to as to the relationship between himself and his wife and her brother and her dad and those things, I'm not going to allow that testimony.

The jury returned, and Moore testified that, while living with Watson, she saw behavior that upset and disturbed her. She described the incident when appellant was present and Watson screamed and threw equipment. She also testified Watson threatened appellant on that occasion. According to Moore, Watson had a physically violent character toward people and objects.

Lochmann testified that Watson repeatedly attempted to contact him and his wife via telephone and email. He stated his opinion of Watson's character for violence was that Watson was a very aggressive and violent person. According to Lochmann, he told appellant that Watson had harassed and threatened him and his wife.[1]

## C.    Verdict and Punishment

The jury rejected appellant's self-defense claim and found him guilty of murder. During the punishment phase, appellant called Moore, who testified regarding Watson's purported drug use, occasions when Watson would be found naked and holding a machete, new testimony that Watson had threatened to kill himself with a shotgun and been taken to a psychiatric ward, that Watson had physically assaulted her, and that he had paranoid delusions. She also claimed she had never seen appellant be violent or aggressive. Lochmann did not testify during the punishment phase.

---

[1] Outside the jury's presence, appellant made an additional offer of proof that Lochmann told appellant that Watson had threatened Lochmann's life. The court sustained the State's hearsay objection to this testimony.

Appellant requested and was granted a sudden passion instruction in the punishment jury charge. Following closing argument, the jury rejected sudden passion and sentenced appellant to life imprisonment and no fine.

Appellant timely appealed.

## Issues Presented

Appellant limits his arguments to the rulings admitting or excluding character evidence. In his first issue, appellant challenges the trial court's ruling sustaining the State's objection to Moore's and Lochmann's testimony describing specific acts of violence or misconduct committed by Watson. In his second issue, appellant argues the trial court erred in admitting opinion testimony of appellant's violent character.

## Analysis

### A. Standard of Review

"We review the trial court's decision to admit or exclude evidence, as well as its decision as to whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice, under an abuse of discretion standard." *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018); *see Neale v. State*, 525 S.W.3d 800, 809 (Tex. App.—Houston [14th Dist.] 2017, no pet.). A trial court abuses its discretion when its ruling lies outside the zone of reasonable disagreement. *Gonzalez*, 544 S.W.3d at 370. We will uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *Roderick v. State*, 494 S.W.3d 868, 874 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

**B.  Whether the Trial Court Erred in Excluding Specific Acts of Violence by Watson**

Appellant contends the trial court erred in refusing to allow Moore and Lochmann to testify about specific acts of violence or misconduct by Watson.  The excluded evidence, appellant says, pertained to the victim's character for violence and supported his self-defense theory.[2]

Although relevant, character evidence is generally inadmissible.  *Sims v. State*, 273 S.W.3d 291, 294 (Tex. Crim. App. 2008).  Evidence of a person's character is not admissible to prove that a person acted in accordance with the character or character trait, and evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that the person acted in accordance with the character.  Tex. R. Evid. 404(a)(1), (b)(1).  Exceptions exist, but even when admissible, character evidence usually may be proven only through opinion or reputation evidence and not through specific instances of conduct.  *See* Tex. R. Evid. 405; *Sims*, 273 S.W.3d at 294.  Evidence of a crime, wrong, or other act—including a victim's prior specific acts of violence—is admissible when offered for a non-character purpose.  Tex. R. Evid. 404(b)(1).

The rules of evidence permit the defendant to offer evidence concerning the victim's character for violence or aggression on two separate theories when, as here, the defendant is charged with an assaultive offense.  *Ex parte Miller*, 330 S.W.3d 610, 618 (Tex. Crim. App. 2009) (citing *Fry v. State*, 915 S.W.2d 554, 560-61 (Tex.

---

[2] Penal Code section 9.31 provides that, subject to certain exceptions, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."  Tex. Penal Code § 9.31(a).  A "reasonable belief" in this context is defined as "one that would be held by an ordinary and prudent man in the same circumstances as the actor."  *Id.* § 1.07(a)(42).  The issue of self-defense is one of fact to be determined by the jury, and a jury's guilty verdict is an implicit finding rejecting this defensive theory.  *See Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018).

App.—Houston [14th Dist.] 1995, no pet.)). One theory is when the defendant attempts to show the reasonableness of the defendant's claim of "apprehension of danger" from the victim. *Id*. A second rationale is to show that the victim was the first aggressor. *Id*. Appellant advanced both theories in the trial court.

*Apprehension of danger.* Under the apprehension-of-danger theory, the defendant may offer reputation or opinion testimony, as well as evidence of specific prior acts of violence by the victim of which the defendant was aware, to demonstrate that the defendant had a reasonable apprehension that he was in danger at the time of the offense. *See Miller*, 330 S.W.3d at 618; *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002); *Green v. State*, 589 S.W.3d 250, 258 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd). "This is called 'communicated character' because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not." *Miller*, 330 S.W.3d at 618. This theory does not invoke rule 404(a)(3) because rule 404 bars character evidence only when offered to prove character conformity, such as that the victim acted in conformity with his violent character. Under this theory, however, the defendant offers the evidence to establish a "self-defensive state of mind and the reasonableness of that state of mind." *Id.* at 619.

*First aggressor.* Additionally, the defendant may offer evidence of the victim's character trait for violence to demonstrate that the victim was, in fact, the first aggressor in a confrontation leading to the alleged offense. *See id.* Here, rule 404 is applicable and this evidence is called "uncommunicated character" because it does not matter if the defendant was aware of the victim's violent character. *Id.* (citing *Mozon v. State*, 991 S.W.2d 841, 845 (Tex. Crim. App. 1999)). Thus, when a witness testifies that the victim made an aggressive move toward the defendant, a witness may testify about the "victim's character for violence, but he may do so *only*

13

through reputation and opinion testimony under Rule 405(a)." *Id.* at 619 (citing *Wilson v. State*, 71 S.W.3d 346, 350 n.4 (Tex. Crim. App. 2002)). Evidence of the victim's prior specific acts of violence is not permitted to show that the victim was the first aggressor. *Miller*, 330 S.W.3d at 620.

### 1. *The trial court did not abuse its discretion in excluding the evidence.*

Although the court permitted Moore and Lochmann to testify as to their respective opinions of Watson's violent character, appellant argues that the court also should have admitted Moore's and Lochmann's testimony describing particular instances of Watson's violent conduct under either the first-aggressor or apprehension-of-danger theories. We address each theory.

#### a. First-aggressor theory

Watson's status as first aggressor may only be shown through reputation and opinion testimony pursuant to rule 405(a). *See* Tex. R. Evid. 404(a)(2), 405(a); *Miller*, 330 S.W.3d at 619; *Allen v. State*, 473 S.W.3d 426, 444 (Tex. App.—Houston [14th Dist.] 2015), *pet. dism'd*, 517 S.W.3d 111 (Tex. Crim. App. 2017). A defendant may not offer evidence of the victim's prior specific acts of violence to prove the victim's violent character and hence that the victim acted in conformity with that character trait at the time of the assault. *Miller*, 330 S.W.3d at 619. Under rule 404(a)(3), appellant was not entitled to offer evidence of any specific prior acts of violence by Watson to show that Watson was the first aggressor. That use is an attempt to prove Watson's conduct conformed with his violent character, which is prohibited. *Id*.

In arguing to the contrary, appellant relies largely on *Dempsey v. State*, 266 S.W.2d 875, 877-78 (Tex. Crim. App. 1954), and its progeny. The *Dempsey* line of cases no longer represents Texas law on this issue, given subsequent changes in the

Rules of Evidence. *See Tate v. State*, 981 S.W.2d 189, 192-93 (Tex. Crim. App. 1998); *see also Torres*, 71 S.W.3d at 761 n.6.

A victim's prior specific acts of violence may be admitted for non-character conforming purposes, Tex. R. Evid. 404(b)(2), *Torres*, 71 S.W.3d at 762; but appellant does not argue that this rule applies to the excluded evidence.

The trial court did not abuse its discretion in excluding Moore's and Lochmann's evidence of Watson's prior specific acts of violence to support appellant's first-aggressor theory.

### b.      Apprehension-of-danger theory

Moore testified outside the jury's presence about the following events:

- Watson destroyed property while enraged, including destroying a television and electrical outlets;
- Watson locked Moore out of the house and, after Moore "banged" on the door for two hours, Watson answered the door naked and holding a machete;
- Moore believed that, on one occasion, Watson might kill a neighbor because Watson thought the neighbor worked for the FBI;
- Watson carried a loaded gun;
- Watson walked outside with a machete;
- Watson shot a street sign with his gun;
- Watson "went nuts" in front of Moore and appellant, destroying appellant's landscaping equipment; and
- An occasion when Watson violently beat, strangled, and threatened to kill Moore.

According to our record, appellant had no awareness of these events, save one—the occasion when Watson became upset at appellant and "went nuts," throwing equipment and screaming. But the trial court permitted Moore to testify

15

about that event. Accordingly, any complaint by appellant as to that testimony presents no error.

As to the other instances of Watson's violent conduct Moore described, she could not recall whether she communicated any of them to appellant. No witness established that appellant knew of them. Because our record does not demonstrate appellant's awareness of the described specific acts, the trial court did not abuse its discretion in excluding them. *E.g.*, *Hayes v. State*, 124 S.W.3d 781, 785-86 (Tex. App.—Houston [1st Dist.] 2003) (when record did not show appellant had knowledge of victim's violent acts, they were inadmissible to show appellant's state of mind), *aff'd*, 161 S.W.3d 507 (Tex. Crim. App. 2005).

Appellant also complains that the trial court erroneously excluded portions of Lochmann's proffered testimony. Lochmann discussed two "stalking" events: one occasion when Watson followed and watched Lochmann inside a grocery store, and a separate occasion when Watson watched Lochmann at his home while speaking to him on the phone. Lochmann believed that Watson once camped near Lochmann's house. Lochmann also testified that Watson had committed burglary and criminal trespass against his then-girlfriend's family.

Like Moore, Lochmann did not testify that he told Watson about these events. Because the record does not show that appellant knew of them, the apprehension-of-danger theory does not support their admission, and the trial court did not abuse its discretion in excluding them. *See id.*

Lochmann, however, told appellant about some of Watson's conduct that disturbed him. Specifically, he told appellant that Watson was "dangerous," had "stalked" Lochmann and his wife, had threatened them both, and specifically threatened to kill Lochmann. Because Lochmann related this conduct to appellant,

16

it is communicated character evidence. *See Miller*, 330 S.W.3d at 618; *Green*, 589 S.W.3d at 259.

Communicated character evidence must be probative of the reasonableness of the defendant's apprehension of danger. *See Allen*, 473 S.W.3d at 448-49. Here, appellant provided two versions of events that occurred before the shooting: (1) Watson threatened appellant verbally and put a gun in his face; and (2) Watson assaulted appellant as he lay on the floor and hit Cerda when she attempted to intervene. Cerda testified that she found Watson assaulting appellant in the kitchen and that Watson hit her when she tried to intervene. Appellant left the immediate scene to retrieve and load his gun, then returned to the kitchen and fired at Watson's back as Watson stood at the sink.

Although Lochmann testified that Watson threatened him and his wife, Lochmann did not testify that Watson ever followed through his threat, that his threat involved the use of a firearm, or that Watson assaulted either him or his wife.

In *Allen*, the appellant contended that the trial court abused its discretion in excluding evidence of the murder victim's character for violence as shown by his prior acts of assaulting his girlfriend and his status as a gang member. *Id.* at 444-45. He urged that this evidence showed the victim was the first aggressor, as well as supported the reasonableness of appellant's apprehension of danger. *See id.* There, we held that the evidence pertaining to the victim's physical abuse of his girlfriend and gang membership "had no clear bearing" on the altercation between the appellant and the victim; thus, the trial court did not abuse its discretion in excluding this evidence. *See id.* at 449. Here, as in *Allen*, appellant simply "has not explained how the specific acts [Lochmann] described and of which appellant was aware affected his belief that the use of deadly force was immediately necessary to protect against [Watson]'s use or attempted use of force." *See id.* at 449 (citing Tex. Penal

17

Code §§ 9.31, 9.32). As we held in *Allen*, we likewise conclude here that the trial court did not abuse its discretion in excluding this evidence.

### 2. *Assuming error, appellant was not harmed.*

Even assuming the trial court erred in excluding the proffered evidence, we would conclude that the error was harmless. Standards for reversible error in criminal cases depend on whether the error is constitutional or non-constitutional. *See* Tex. R. App. P. 44.2; *Mercier v. State*, 322 S.W.3d 258, 261 (Tex. Crim. App. 2010). Errors in sustaining the State's objections to the admission of a defendant's evidence generally are non-constitutional. *Easley v. State*, 424 S.W.3d 535, 540 (Tex. Crim. App. 2014). A constitutional violation may arise only if "(1) a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence vital to his defense; or (2) a trial court's clearly erroneous ruling results in the exclusion of admissible evidence that forms the vital core of a defendant's theory of defense and effectively prevents him from presenting that defense." *Id*.

Invoking the second situation, appellant contends that the exclusion of Moore's and Lochmann's testimony about Watson's prior specific violent acts is constitutional error because the ruling prevented him from presenting his self-defense claim. On this record, we disagree. Appellant introduced significant evidence pertaining to his self-defense claim, including his theories that Watson was the first aggressor and that appellant reasonably feared Watson was dangerous. For example, the jury heard appellant's version of events in his recorded statements. He stated that Watson threatened to kill him and pointed a shotgun at his face, and that Watson "sucker-punched" and physically assaulted him before the shooting. When Cerda attempted to intervene, Watson hit her in her eye. Cerda's account of the event was generally consistent with appellant's description. Cerda even said that,

18

before the shooting, she saw Watson in the pantry looking for something on a shelf behind the garbage can (where the police later found the shotgun). Her testimony in that regard could have supported appellant's claim that he saw Watson reach for something in the pantry—believed to be a shotgun—before he killed Watson. Both Lochmann and Moore presented their opinions that Watson was violent; Moore even described a specific incident when Watson behaved very violently in appellant's presence. Given the nature of this evidence, "[a]ppellant was not effectively prevented from presenting his defensive theory, and the excluded evidence would have incrementally furthered the defensive theory." *Green*, 589 S.W.3d at 261. We thus conclude that the alleged errors are non-constitutional. *See id.*

Non-constitutional errors that do not affect the defendant's substantial rights must be disregarded. *See* Tex. R. App. P. 44.2(b); *Green*, 589 S.W.3d at 261 (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). Error affects a substantial right when it has a substantial and injurious effect or influence in determining the jury's verdict. *See Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (citation and internal quotation marks omitted). When we assess the likelihood that the jury's decision was adversely affected by the error, we consider everything in the record, including all evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instructions, the State's theory and any defensive theories, closing arguments, and whether the State emphasized the error. *Motilla v. State*, 78 S.W.3d 352, 355-56 (Tex. Crim. App. 2002); *see also Haley*, 173 S.W.3d at 518-19.

19

On balance, we have fair assurance here that any error made in excluding Moore's and Lochmann's testimony of Watson's specific violent acts did not have a substantial and injurious effect or influence in determining the jury's verdict. As explained, the jury had before it considerable evidence relevant to and supporting appellant's self-defense claim, including evidence of Watson's violent character. The jury heard that: (1) Watson had previously assaulted appellant; (2) Watson had taken appellant's shotgun, sawed off the barrel, and shot out both a television and a window; (3) Watson hid the shotgun around the residence; (4) Watson was on felony probation for stalking; (5) Watson had threatened appellant with a shotgun and sucker-punched and assaulted appellant on the night in question; and (6) appellant was in fear for both his and Cerda's lives. Cerda testified that she found Watson assaulting appellant and, when she attempted to intervene, Watson hit her. Cerda stated Watson shot out a television and a window, and she also testified that Watson previously had looked for appellant while holding and shooting the shotgun. The trial court permitted Moore to testify as to Watson's violent outburst in front of appellant and that Watson threatened appellant. Further, Lochmann testified generally that Watson both harassed and threatened him and his then-girlfriend. Both Moore and Lochmann opined that Watson was violent. The autopsy report and medical examiner testimony lent some weight to appellant's claim because they revealed Watson's blood-alcohol level was over the legal limit when he died, and he had other intoxicating substances in his body. Finally, appellant's counsel argued in closing that Watson was a violent person whom appellant feared.

In contrast to the evidence supporting appellant's self-defense claim, the State presented substantial evidence that would support a factfinder's decision to reject the defense. Undisputed facts, inconsistent statements, and implausible explanations supply considerable evidence of guilt. *See Guevara v. State*, 152 S.W.3d 45, 50

20

(Tex. Crim. App. 2004) (noting that inconsistent statements and implausible explanations are circumstances of guilt). For instance, appellant admitted that he fired the first shot at Watson from behind, when Watson was no longer holding the shotgun. Refuting appellant's claims that Watson then came at him, Watson had no bullet wounds to the front of his body. And appellant gave notably inconsistent accounts to police. Though he claimed Watson pointed a shotgun at his face and threatened his life, the shotgun was found in the pantry behind several dusty bottles; no weapons were found on or near Watson's body at the scene. Additionally, the jury heard a recording of appellant offering to plant heroin in the home of Lisa Good's estranged husband and send him to prison for life. On this recording, appellant was heard stating that he could do to Good's husband what he had done to Watson, made a gun noise, and mimicked a gun with his hand.

The jury rejected appellant's and his witnesses' claims that he acted in self-defense, as was its right. *See Cain v. State*, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997) (indicating that jury has sole province to decide what weight is to be given to contradictory testimony as it turns on evaluation of credibility and demeanor). We hold that the trial court's exclusion of Moore's and Lochmann's evidence of Watson's prior violent acts did not substantially injure appellant's rights, and the error, if any, was harmless. *See Green*, 589 S.W.3d at 262 ("Accordingly, the jury heard plenty of other evidence concerning the decedent's threats and animosity toward appellant."); *Smith*, 355 S.W.3d at 151-52 (explaining that, because the appellant offered other direct evidence that the decedent was the first aggressor and that the appellant reasonably believed he was in danger during his altercation with the decedent, the court had "fair assurance here that any error made in excluding [the decedent's] earlier stabbing incident . . . did not have a substantial and injurious effect or influence in determining the jury's verdict").

21

We overrule appellant's first issue.

**C. Whether the Trial Court Erred in Admitting Evidence of Appellant's Character**

In his second issue, appellant contends the trial court erred in admitting, over objection, evidence of his own character. Though generally inadmissible, character evidence may be permitted for reasons other than character conformity, such as rebutting a theory of self-defense. *Henricks v. State*, 293 S.W.3d 267, 274 (Tex. App.—Eastland 2009, pet. ref'd) (State's evidence of defendant's character admissible to rebut self-defense theory); *see Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001).

Appellant complains about the testimony of two witnesses, Codi Craddock and Bryan Cupp, each of whom stated in the form of opinion testimony that appellant was violent. Appellant raised a claim of self-defense. He presented his self-defense theory during jury selection, during opening statements, and through cross-examination of the State's witnesses. We have summarized much of appellant's self-defense evidence above. Additionally, appellant's counsel asked the medical examiner whether it would still be possible for someone with gun wounds such as Watson's to shoot a firearm before the instantly fatal head shot. He emphasized with the BCSO dispatcher that appellant stated he had been threatened by Watson. He asked Cerda whether she had seen Watson act violently or erratically before the shooting. He focused his cross-examination of Cerda on Watson's shooting out a window while holding a shotgun and looking for appellant. The jury heard appellant's recorded statements, in which he claimed he feared for his or Cerda's life at the time he shot Watson. Thus, appellant's defensive theory was presented from the very start of trial, and some evidence supporting this theory was presented to the jury before the opinion testimony offered by either Craddock and Cupp.

23

Under these circumstances, the trial court could have determined that the character evidence at issue had relevance apart from character conformity because it rebutted appellant's self-defense claim. *See Henricks*, 293 S.W.3d at 274; *see also Allen v. State*, No. 14-12-01086-CR, 2014 WL 3587372, at \*7 (Tex. App.—Houston [14th Dist.] July 22, 2014, pet. ref'd) (mem. op., not designated for publication).

Moreover, even if the trial court erred in admitting this very brief testimony concerning these witnesses' opinions that appellant was violent, any error in the admission of this evidence was harmless. As noted, in performing a non-constitutional harm review, we consider everything in the record, including all evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instructions, the State's theory and any defensive theories, closing arguments, and whether the State emphasized the error. *See Motilla*, 78 S.W.3d at 355-56; *see also Anderson v. State*, 717 SW.2d 622, 627-29 (Tex. Crim. App. 1986) (concluding that erroneous admission of opinion testimony concerning the appellant's violent character was not harmful). Erroneously admitted evidence will not result in reversal when other evidence, or substantially similar evidence, was received without objection—either before or after the complained of ruling. *Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *see also Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (noting any error was harmless in light of "very similar" evidence admitted without objection); *Anderson*, 717 S.W.2d at 628 (holding that any error in admitting opinion testimony about the appellant's and his family's violent character was rendered harmless by admission of other evidence showing this violent character).

Here, other evidence showed appellant's violent character, which rendered the complained-of admitted evidence generally cumulative. For example, appellant shot Watson, at close range and from behind, six times. The final—and fatal—shot was to Watson's head. Appellant admitted that he initially shot Watson while Watson stood, unarmed, at the kitchen sink. He told the BCSO dispatcher that he had to kill Watson because Watson threatened to kill him. And significantly, the jury heard a recording in which appellant threatened to plant heroin on Lisa Good's estranged husband and then seemingly offered to kill him. In light of this evidence illustrative of appellant's violent character, we conclude that the admission of Craddock's and Cupp's opinion testimony was harmless. *See Anderson*, 717 S.W.2d at 628.

We overrule appellant's second issue.

## Conclusion

Having overruled both of appellant's issues, we affirm the trial court's judgment.

/s/     Kevin Jewell
         Justice

Panel consists of Justices Jewell, Poissant, and Wilson.

Publish — Tex. R. App. P. 47.2(b).